**Alfred IZQUIERDO, a Resident of the City of Wilmington, State of Delaware, Plaintiff,**

**v.**

**James SILLS, Jr., Mayor of the City of Wilmington—City of Wilmington resident; in official capacity; Mary Dees, Director of Personnel of the City of Wilmington—a Wilmington resident; in official capacity; Samuel D. Pratcher, Chief of Police of the City of Wilmington—a Wilmington resident; both in official capacity and individually; Michael Boykin, Inspector of the City of Wilmington Police Department—Head of the Office Professional Standards for the Wilmington Police Department—a Wilmington resident, both in official capacity and individually; Captain Gilbert Howell of the Wilmington Police Department—a City of Wilmington resident, both in official capacity and individually; Captain Rita Crowley, of the Wilmington Police Department— a City of Wilmington resident in official capacity; Captain John Monaghan, of the Wilmington Police Department—a Wilmington resident, in official capacity; Captain Keith Ashe, of the City of Wilmington Police Department—a Wilmington resident, in official capacity; Master Sgt. Henry Alfree of the Wilmington Police Department—a Wilmington resident, in both official and personal capacity; Sgt. Corey Staats of the Wilmington Police Department—a Wilmington resident, in official capacity, William J. Rhodunda, Jr., Esq., Asst. City Solicitor of the City of Wilmington—a Wilmington resident, in official capacity; Carolyn R. Schlecker, Esq.,**

City Solicitor of the City of Wilmington—a Wilmington resident, both in official and individual capacity; and The Municipality of the City of Wilmington, Delaware and its City Council, Defendants.

No. Civ.A.97–495MMS.

United States District Court, D. Delaware.

Argued: July 26, 1999.

Dated: Aug. 20, 1999.

Victor F. Battaglia, Biggs & Battaglia, Wilmington, DE, for plaintiff.

Jan A.T. van Amerongen, Jr., Duane, Morris & Heckscher LLP, Wilmington, DE, for defendants.

## *OPINION*

SCHWARTZ, Senior District Judge.

This is an action challenging disciplinary decisions made by the Wilmington Police Department through its administrative disciplinary process. Plaintiff Alfred Izquierdo ("Izquierdo") filed an Amended Complaint in the Delaware Court of Chancery alleging violations of his federal civil rights pursuant to 42 U.S.C. §§ 1983, 1985, 1986, breach of contract and breach of duties under the Delaware Law Enforcement Officers' Bill of Rights ("Bill of Rights"), 11 Del.C. § 9200 *et seq.*, against the City of

Wilmington ("City"); James Sills, Mayor of the City of Wilmington ("Sills"), in his official capacity; Mary Dees, Director of Personnel of the City of Wilmington ("Dees"), in her official capacity; Samuel D. Pratcher ("Pratcher"), Chief of Police of the City of Wilmington, in both his official and individual capacities; Michael Boykin ("Boykin"), Inspector of the City of Wilmington Police Department ("WPD"), in both his official and individual capacities; Captain Gilbert Howell of the WPD ("Howell"), in both his official and individual capacities; Captain Rita Crowley of the WPD ("Crowley"), in her official capacity; Captain John Monaghan of the WPD ("Monaghan"), in his official capacity; Captain Keith Ash of the WPD ("Ash"), in his official capacity; Master Sergeant Henry Alfree of the WPD ("Alfree"), in both his official and individual capacities; Sergeant Corey Staats of the WPD ("Staats"), in his official capacity;[1] William J. Rhohunda, Assistant City Solicitor for the City ("Rhohunda"), in his official capacity; and Carolyn R. Schlecker, City Solicitor for the City ("Schlecker"), in both her official and individual capacities.[2] Docket Item ("D.I.") 1, Exh. C. The Defendants removed the action to this Court pursuant to 28 U.S.C. § 1441, D.I. 1, and answered the Amended Complaint, D.I. 4.[3] The parties have completed discovery. Before the Court is Defendants' Motion for Summary Judgment. D.I. 37.

## I. Standard for Granting Summary Judgment

Under the Federal Rules of Civil Procedure, the Court shall grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the Court must "view all facts and inferences in the light most favorable to the party opposing the motion." *Stephens v. Kerrigan,* 122 F.3d 171, 176–77 (3d Cir.1997).

The Supreme Court has clarified that the moving party must "bear the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a demonstration has been made, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989).

## II. Facts

Izquierdo's claims are detailed in his 33–count Amended Complaint. D.I. 1, Exh. C.

---

1. Izquierdo initially named Staats as a defendant in both his official and individual capacity. However, by stipulation of the parties, those claims against Staats in his individual capacity were dismissed with prejudice on December 14, 1998. Docket Item ("D.I.") 28.

2. The Court has used the titles and positions held by the individual defendants at the time of the incidents alleged in the amended complaint.

3. Title 28, section 1441(a) of the United States Code provides for removal from state court to the United States district court of "any civil action brought in a state court of which the district courts of the United States have original jurisdiction." The Court has federal question jurisdiction over Izquierdo's federal civil rights claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

All of his claims arise out of the investigation and disciplinary process to which he was subject after a civilian lodged a complaint about the use of force against him. He does not appeal the merits of the outcome of the disciplinary process, which resulted in his suspension followed by reinstatement, but seeks damages for the way in which those involved carried out that investigation and disciplinary process. He bases his state law claims on theories of breach of the collective bargaining agreement, which includes provisions for the discipline of officers, and on the Bill of Rights, which governs the discipline of law enforcement officers in Delaware in the absence of other agreements between officers and their employer. Izquierdo's federal question claims allege he was deprived of his constitutional right to be free from deprivation of property without due process of law under color of state law in violation of 42 U.S.C. § 1983. He further alleges that some of the defendants conspired to violate his constitutional rights in violation of 42 U.S.C. §§ 1985 and 1986. He seeks a court order expunging his disciplinary record, lifting of his post-suspension probationary status, and economic damages, punitive damages and attorney's fees and costs.

The following facts surrounding Izquierdo's claims are undisputed.

## A. Background

The investigation and disciplinary process at issue arose from events which took place on January 27, 1996, and the early morning of January 28, 1996, when Officer Izquierdo was working an extra-duty job with two other Wilmington Police Officers [4] at a Wilmington night club. Izquierdo and the other officers became involved in an altercation with three civilians, Dennis Givens ("Dennis"), Keith Givens ("Keith") and Christopher Malinowksi ("Malinowski" and collectively "complainants"), during the course of which one or more of the officers used force on one or more of the civilians with one or more blows.[5] None of the complainants were arrested. Instead, they left the night club and went to Wilmington Police Headquarters. There, they attempted to file complaints against Izquierdo and the other officers with the House Sergeant.

At least of one of the officers has admitted the three officers involved did not report the use of force at the time of the altercation. Rather, after being ordered to report to the House Sergeant, they told him about the use of force. In the Use of Force Report he filed with the Chief of Police, the House Sergeant reported only that "Officer Izquierdo was threatened by [Dennis] Givens, he drew his nightstick and struck [Dennis] across the right arm." A–41.[6] However, in a statement made during the subsequent investigation by the Office of Professional Standards, Izquierdo admitted recalling Dennis had an injury to his head, although no force to the head was reported. Dennis was subsequently arrested and charged with terroristic threatening and menacing.

---

4. The briefs and supporting materials tendered by the parties in the course of arguing this motion were filed under seal pursuant to a confidentiality order, D.I. 20, because the disciplinary procedures of the Wilmington Police Department are confidential. First Amendment concerns this opinion not be sealed. However, because disclosure of the names of other Wilmington Police Officers involved in disciplinary proceedings is unnecessary to the disposition of the case, and those officers are not parties to this litigation, the Court will refer only to them as the other officers or by appropriate "pseudonyms."

5. The number of blows and the number of persons actually struck by those blows is irrelevant except to the extent that several different stories were told during the investigation and disciplinary process by the various individuals involved in the altercation.

6. References to defendants' appendix (D.I.39) appear as A–___; references to Izquierdo's appendix (D.I.45) are appear as B–___; and references to defendants' supplemental appendix (D.I. 47) appear as C–___.

Dennis and Keith subsequently filed complaint forms alleging the inappropriate use of force by Izquierdo and the other Officers during the night club altercation. Staats, who was at that time assigned to OPS, began an investigation of the complaints. Izquierdo and the other officers were notified of the complaints in writing by a Notification of Complaint. The officers responded to the Notification of Complaint by each filing a Departmental Information.

On March 15, 1996, Staats interviewed Dennis and Keith. Those interviews were tape recorded and subsequently transcribed. Staats spoke to each of the brothers before turning on the tape recorder. Malinowski, the third civilian complainant, made a tape recorded statement March 20, 1996.

On March 18, 1996, one of the officers against whom the complainants lodged their complaint, Officer S,[7] accompanied by his attorney, provided a tape recorded interview to Staats. Also present were Master Sergeant Victor Ayala and Rhohunda, the Assistant City Solicitor. He gave the interview because his previous Departmental Information had been inaccurate, changing his testimony to reflect the fact that he had struck Keith and adding other facts to his account.

The same day, another of the three officers, Officer J,[8] accompanied by his attorney, provided information not included in his Departmental Information. During that interview, he admitted his Departmental Information was inaccurate because he witnessed Officer S use force and that he recalled Izquierdo striking Dennis twice.

On March 25, 1996, Staats interviewed Izquierdo, in the presence of Rhohunda and Izquierdo's then-counsel.[9] Izquierdo maintained his contention that he had struck Dennis only once, and other contentions that contradicted the stories of Officers S and J.

At the same time Officers S and J were coming forward to change or correct their testimony, counsel for Officer S, Ronald Stoner. Esq. ("Stoner"), contacted Assistant City Solicitor Anthony Forcina ("Forcina"), who was prosecuting Dennis for the charges stemming from the night club altercation in Municipal Court. Stoner told Forcina the charges should be dropped because Officer S had lied. After Forcina contacted others in the City Solicitor's office, City Solicitor Schlecker determined the misdemeanor charges against Dennis should be dropped, out of a concern that one or more of the officers might perjure themselves. A *nolle prosequi* was entered in the case.

During the investigation, Staats superiors were kept advised of the progress of the investigation as part of the chain of command. In particular, Inspector Boykin informed Chief of Police Pratcher about things "the chief should know about." B–17. Among other things, Pratcher was informed when two officers changed or supplemented their Departmental Informations.

On March 25, 1996, Captain Howell notified Izquierdo and the other Officers that they were assigned to administrative duties effective immediately. While assigned to administrative duty, the officers were prohibited from carrying weapons, on or off duty, and from working any extra-duty or overtime assignments.

After completing the investigation, Staats prepared an investigative report. When Staats completed the report on April 12, 1996, he presented it to Howell, who signed off on the report. Staats then prepared an "information packet" and the charge papers against Izquierdo, the other Officers and the House Sergeant. Izquier-

7. Officer S is a non-party officer.

8. Officer J is also a non-party officer.

9. At the time, Izquierdo was represented by Robert McDonald, Esq. His current counsel entered this matter at a later time.

do was served with his charge packet on April 17, 1996. Izquierdo, through counsel,[10] requested he receive the radio transmission log regarding the night club altercation. No further requests for discovery were made.

## B. The First Complaint Hearing Board

On May 13, 1996, the First Complaint Hearing Board ("CHB"), comprised of Ash, Crowley and Monaghan, convened to hear evidence on the charges against Izquierdo, Officer S, Officer J and the House Sergeant. Officer S, through counsel, moved to dismiss the charges in their entirety. Izquierdo and the House Sergeant joined in the motion. Counsel's argument had two prongs: 1) the provisions in the WPD Directions and in the Bill of Rights (11 Del.C. § 9204) require a hearing be held no more than 30 days following the conclusion of an investigation (the "30-day rule"); and 2) Staats had not complied with the discovery requirements of 11 Del.C. § 9200(c)(7). After granting both sides an opportunity to be heard and deliberation, the First CHB determined Staats had not violated the Bill of Rights § 9200(c)(7) rules regarding discovery. However, the Board further determined that for purposes of the 30-day rule the investigation had concluded April 12, 1996, and therefore dismissed the charges against all four officers.

## C. The First Appeal

On May 16, 1996, Howell addressed an appeal of the First CHB's dismissal of the

charges against all four officers.[11] On May 17, 1996, Pratcher signed his approval of the appeal. It is uncontradicted that such approval of an appeal by the Chief was a routine followed with every appeal by OPS.

The First Appeal Board consisted of Pratcher, Dees and Master Sergeant John Fogelson, who represented the Union pursuant to the requirements of the collective bargaining agreement ("C.B.A.") between the City and the police union.[12] Rhohunda was present as legal advisor to the First Appeal Board. Schlecker was present to assist OPS in presenting the appeal. At the hearing, Izquierdo renewed the motion to dismiss, and presented his arguments regarding the 30-day rule. The First Appeal Board then watched the videotape of the First CHB and heard the testimony of Sergeant Staats. At that hearing, the First Appeal Board made some preliminary evidentiary rulings in favor of Izquierdo, and others in favor of OPS. After deliberation, the First Appeal Board determined that the 30-day period had begun to run when each of the Officers was served with the charges against them, and reversed the First CHB decision, remanding the matter for a new hearing.

## D. The Second Complaint Hearing Board

By letter dated May 31, 1996, counsel for Izquierdo requested discovery. Staats provided records of the Wilmington Hospi-

10. At this time, and throughout the remainder of the disciplinary process and in the present action, Izquierdo has been represented by Victor F. Battaglia, Jr.

11. Izquierdo seems to suggest there is evidence on the record that Pratcher ordered or decided to pursue the appeal. However, the undisputed evidence shows that Howell alone made the decision to appeal. The evidence further indicates that Howell informed Boykin of this decision. The evidence cited by Izquierdo, testimony by Master Sergeant Victor Ayala, shows only that he believed that after Howell had been speaking with the Chief he came back and said, "[T]his has to

be appealed, or appeal this." B–40. Ayala also testified that he did not know who ordered the appeal—Pratcher or Howell. B–40 ("I am not sure if it was Captain Howell or the Chief [who ordered the appeal]."). The testimony of Howell and Boykin that Howell made the decision to appeal on his own, without orders from Chief Pratcher is, therefore undisputed.

12. Section 11.11(a) of the C.B.A. requires that the Appeal Board be composed of the Chief of Police, the Personnel Director of the WPD and the President of the Union, or, in each case, that individual's designated representative. C.B.A., § 11.11(a), A–378.

tal Emergency Room indicating Dennis had refused medical treatment. Staats testified he did not have possession of those records before the First CHB, but obtained them from the records division and forwarded them to counsel upon request.

The Second CHB, comprised of the same personnel as the First CHB, reconvened June 19, 1996. Izquierdo filed two separate motions to dismiss and Officer S resubmitted his original motion to dismiss. All four accused Officers joined in those motions.

Counsel again argued that the original CHB had been held in violation of the 30–day rule and that a failure by Staats to keep a complete record of witness interviews constituted discovery violations under the Bill of Rights. The attorneys argued the Second CHB was not bound by the Directives to follow the determination of the First Appeal Board. Counsel for Izquierdo further argued that the hospital records had not been given to him in a timely fashion.

The Second CHB determined the first Appeal Board had already ruled on the 30–day rule issue. It further decided that the records kept by Staats were complete, but that they would allow counsel to raise issues during the proceeding as they arose.

After opening arguments and the moving of certain documents into evidence, the Second CHB heard the testimony of the civilian complainants, Officers S and J, the House Sergeant and Izquierdo. At the end of this testimony, which included direct and cross-examination, along with questions by members of the CHB, OPS closed its case. At that time, the Second CHB dismissed some of the charges against Officer J and the House Sergeant. However all charges against Izquierdo and Officer S remained open.

Counsel for Officer S called Staats as a witness. Izquierdo moved into evidence the statement of the night club manager. The Second CHB recessed to deliberate. After deliberations, the Second CHB announced unanimous findings regarding Izquierdo's culpability. They found insufficient evidence to support charges of improper use of force and failure to provide medical treatment to a prisoner. However, they found the charges of dishonesty, inaccurate reports and failure to report the use of force were supported by sufficient evidence. The Second CHB solicited recommendations on an appropriate sentence from Izquierdo and OPS.

After further deliberations, the Hearing Board announced its unanimous decision as to Izquierdo's penalty. The Board imposed a 10–day suspension for failing to report use of force, a 10–day suspension for inaccurate reports, and dismissal for dishonesty. The Second CHB submitted a synopsis of its findings to Acting Chief Vignola and, on June 22, 1996, submitted a detailed account of the proceedings.

### E. The Second Appeal

On June 26, 1996, Izquierdo appealed the determination of guilt and imposition of penalty by the Second CHB.[13] By letter dated July 19, 1996, counsel for Izquierdo requested complete copies of the videotapes from the Second CHB. He also stated, "It is my understanding that the Appeal Board has not yet been configured nor convened. Please notify me when it has been and a date set." A–328. On August 5, 1996, counsel sent another letter, which, in addition to following up on the request for videotapes, stated, "Even though an Appeal Board has not yet been convened nor configured, time is of the essence for this office to prepare adequate representation for Mr. Izquierdo, therefore, please record these tapes as soon as possible. If your Department does create a hearing date please contact me in writing as soon as possible." A–330.

13. Acting Chief Vignola initially appealed the Second CHB's decision regarding the other three charged officers, but the decision to appeal those determinations was rescinded.

The next day, by identical letters to Staats, Howell and Dees, counsel for Izquierdo wrote that he objected for the first time to the length of time it was taking to schedule the Second Appeal Board. Counsel complained that "the city of Wilmington's time delay has been excessive and has prejudiced my client and has been detrimental to his due process and property interests." A–331. Suggesting the possibility that Izquierdo would go to the Court of Chancery to force the Police to set a date, counsel further stated, "I expect this appeal to be heard within the month of August—a date which will allow myself adequate preparation." A–332.

On August 13, 1996, counsel for Izquierdo sent a letter to Dees acknowledging a date of August 27, 1996, had been set for the Appeal Board. Counsel also demanded reinstatement and back-pay from the time terminated, alleging the Directive did not permit imposition of a penalty pending appeal.

By letter dated August 16, 1996, counsel for Izquierdo requested Boykin remove Pratcher and Dees from the Second Appeal Board on the basis of "bias and prejudice against the Appellant Officer Izquierdo." A–340. That letter indicated that Pratcher and Dees had prior knowledge of the case because they had sat on the First Appeal Board. He further noted that each might be named in a mandamus action not yet filed.[14] Finally, he noted that Pratcher had publicly defended the actions of the Wilmington Police Department, including the disciplinary process. Inspector Boykin denied the request, finding "no compelling facts or information that would preclude either [Dees] and [Pratcher] from participating as part of the Appeal panel for Officer Izquierdo." A–349.

The Second Appeal Board convened, as scheduled, on August 27, 1996. That hearing consisted of arguments by counsel for Izquierdo, including renewal of his motion to dismiss, and deliberation by the Second Appeal Board. The Second Appeal Board denied the bulk of Izquierdo's arguments. However, it did agree, by majority decision, that the penalty of termination was too harsh, modifying Izquierdo's sentence to a total of 50 days suspension. The Second Appeal Board gave Izquierdo credit for the time between his termination and the Second Appeal Board's decision. This enabled him to return to duty on September 3, 1996.

### III. Discussion

Defendants raise several arguments in support of summary judgment. First, they contend that the City is not liable for the alleged § 1983 violation and that consequently, the claims against the City and against those defendants named only in their official capacity ought to be dismissed. Secondly, they contend that Izquierdo has not, and cannot, state a claim for relief under §§ 1985 and 1986. Because Izquierdo, in his answering brief, concedes this issue, the Court will dismiss these claims without further consideration. Third, the individual defendants assert absolute and/or qualified immunity. Fourth, the defendants urge dismissal of all the state law claims on various grounds. Because the Court will grant summary judgment on each of Izquierdo's federal question claims, the Court will remand the state law claims to the Court of Chancery. Finally, the defendants urge that even if the Court does not dismiss Izquierdo's claims against the City and the individual defendants in their official capacities, the City and the individual defendants in the official capacities would be immune from

14. On August 23, 1996, Izquierdo filed a petition for a Writ of Mandamus in Delaware Superior Court against Sills, Dees, Pratcher, Crowley, Monaghan and Ash. Izquierdo sought an order compelling the named individuals to rescind their sentence of termination and their imposition of that penalty, reinstatement to former position and rank, and back pay. However, the Defendants were never served with the writ, and on September 9, 1996, Izquierdo notified the Superior Court that he wished to dismiss the petition.

punitive damages under § 1983. Once again, because the Court concludes that summary judgment on Izquierdo's § 1983 claims is appropriate, the Court will not reach the issue. The Court now addresses each group of arguments raised by Defendants separately.

## A. Liability of the City and Individual Defendants Named in their Official Capacity for Violations of § 1983

Defendants urge the Court to dismiss the claims against the City and the individual defendants in their official capacities. Because the Court finds that Izquierdo cannot meet the requirements for municipal liability under § 1983 set forth by the Supreme Court in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny, the suit against the City of Wilmington will be dismissed. Further, because the City may not be held liable, the individual defendants sued in the official capacities may also not be held liable for violations of § 1983. Accordingly, the Court will grant summary judgment to the City of Wilmington with respect to Izquierdo's claims for violations of § 1983 and any individual defendants named only in their official capacity accused of § 1983 violations.[15]

### 1. *Claims Against the City for Violations of § 1983*

The Amended Complaint, seemingly adopting a blunderbuss approach both as to legal theories and named defendants, has the additional vice of suffering from a lack of clarity. The Court was able; at oral argument, to sort out and clarify Izquierdo's theories, contentions and prof-

fers of evidence to support those theories and contentions.

Counts XXIX and XXX are the only § 1983 claims against the City. Count XXIX alleges Pratcher denied Izquierdo a fair and impartial hearing in violation of 42 U.S.C. § 1983. D.I. 1, Exh. C, ¶ 124. Count XXIX further alleges that Pratcher, as final decision-maker "established a pattern of behavior or policy under guise of City policy, which Defendant City tolerated, that was in direct contravention of Plaintiff's guarantee of employment, the right to be free from prosecution (30–day Rule) and right to a fair and impartial hearing."[16] *Id.*, Exh. C., ¶¶ 125, 127. Count XXX alleges Howell, Boykin, Alfree, Staats, and Schlecker, through conduct alleged in earlier counts, "deprived Plaintiff of fair board hearings (both hearing and appeal) and under contrived Wilmington Police Department policies which Defendant City tolerated." Despite these allegations, Izquierdo has not adduced sufficient facts demonstrating the existence of material fact sufficient to survive summary judgment in his claims against the City.

The Court will first review the law of municipal liability under § 1983 and then turn to the specific claims plaintiff makes in support of municipal liability.

### a. The Law of Municipal Liability

In *Monell,* the Supreme Court ruled "that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." 436 U.S. at 694, 98 S.Ct. 2018. Rather, the *Monell* Court ruled that to recover monetary, declaratory, or injunctive relief from a municipality such as the City of Wilmington, a plaintiff must show either: 1) "the action that is alleged to be unconstitutional imple-

**15.** The Court believes that the Amended Complaint accuses only one individual defendant named only in his official capacity, Staats, of violating § 1983. However, to the extent that the Amended Complaint might have been intended to implicate other individual defendants named only in their official capacity, *see* e.g. D.I. 1, Exh. C, ¶ 70 (arguably implicating

the Hearing Board Members in an alleged civil rights violation), such a claim is barred for the reasons discussed herein.

**16.** Plaintiff concedes the "30–day rule" does not fall under the protections of procedural due process. D.I. 44, at 15 n. 1 and 19.

ments or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers", or 2) that the constitutional deprivation was "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.* at 690–91, 98 S.Ct. 2018. The Third Circuit appellate court has explained *Monell* and its progeny, "[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996); *accord Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1295–96 (3d Cir.1997).

i. Locating a Policy or Custom

▉▉▉ A municipal policy may be shown in two different ways. First, municipal liability may attach where an employee or agent of the municipality acts pursuant to an official policy or edict of the municipality. *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Secondly, a single action "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered," can constitute a "policy" for purposes of establishing municipal liability. *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292 (Brennan, J., plurality opinion); *see also Jett v. Dallas Independent School District,* 491 U.S. 701, 736, 109 S.Ct. 2702, 105 L.Ed.2d 598 (determining whether individuals had final policymaking authority to terminate an employee such that their action could be considered official municipal policy).

▉▉▉ The Supreme Court has delineated the scope of municipal liability by focusing on the role and function of the policymakers in any given municipality. The Court has explained,

the authority to make municipal policy is necessarily the authority to make final policy. [*Pembaur,*] 475 U.S. at 481–484, 106 S.Ct. 1292. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (O'Connor, J., plurality opinion); *accord id.,* at 141–42, 108 S.Ct. 915 (Brennan, J., concurring); *Pembaur,* 475 U.S. at 481–82, 106 S.Ct. 1292 (Brennan, J., concurring) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."); *Bailey v. Wilmington,* No. CIV.A. 96–264 MMS, 1997 WL 736885, at *3 (D.Del. Nov. 19, 1997), *aff'd,* 173 F.3d 420 (3d Cir.1998) (unreported table decision). Furthermore, the policymaker's decision making authority must be final with respect to the particular action alleged to be municipal policy. *Praprotnik,* 485 U.S. at 123, 108 S.Ct. 915 (O'Connor, J., plurality opinion); *id.,* at 139–40, 108 S.Ct. 915 (Brennan, J., concurring); *Pembaur,* 475 U.S. at 482–83 & n. 12, 106 S.Ct. 1292 (Brennan, J., plurality opinion); *Bailey,* 1997 WL 736885, at *3–*4. Accordingly, the identity of the official policymakers is of key importance to the municipal liability inquiry. "[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the

trial judge." *Jett,* 491 U.S. at 737, 109 S.Ct. 2702. The Court has explained,

> Reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority of the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*Id.* Once the policymakers have been identified, it is possible to determine whether they established the policy or took the actions alleged to have caused the constitutional violation.

▆▆▆ Municipal liability under § 1983 may also arise from constitutional "violations visited pursuant to governmental 'custom.'" *Monell,* 436 U.S. at 658, 98 S.Ct. 2018. The precedents of the Third Circuit Court of Appeals teach that a plaintiff may demonstrate the existence of a "custom" in one of two ways. First, custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990); *accord Beck,* 89 F.3d at 971. Secondly, "[c]ustom ... may also be established by evidence of knowledge and acquiescence" by the final policymakers in the area. *Beck,* 89 F.3d at 971 (citing *Fletcher v. O'Donnell,* 867 F.2d 791, 793 (3d Cir.1989)). However, a plaintiff need not identify knowledge and acquiescence of a practice so "permanent and well settled" as to have "the force of law," *Monell,* 436 U.S. at 691, 98 S.Ct. 2018, since such customs are "ascribable to municipal decisionmakers." *Bielevicz,* 915 F.2d at 850 (internal quotations omitted) (quoting *Anela v. City of Wildwood,* 790 F.2d 1063, 1067 (3d Cir.1986)); *see also id.* at 853 ("Such well-established custom exists only with the approval or, at the very least, with the sufferance of policymakers"). A plaintiff cannot prove a custom simply by citing one instance of the custom asserted. *Groman v. Twp. of Manalapan,* 47 F.3d 628, 637 (3d Cir.1995); *Fletcher,* 867 F.2d at 793. However, a showing that a well-established practice exists, and that the municipality has done nothing to end or change the practice, supports a finding of a custom attributable to the municipality. *See Bielevicz,* 915 F.2d at 852–53 (finding no basis for a directed verdict in favor of a municipality upon such a showing at trial).

### ii. Culpability and Causation

▆▆▆ The location of a policy or custom attributable to the municipality through its final decisionmakers is only the first step in determining whether the municipality may liable for violations of § 1983. Rather,

> it is not enough for a § 1983 plaintiff merely to identify conduct attributable to a municipality. The plaintiff must also demonstrate that through its deliberate conduct the municipality is the 'moving force' behind the injury alleged. That is, the plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of County Commissioners of Bryan Cty. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *accord, e.g., Jett,* 491 U.S. at 737, 109 S.Ct. 2702 (holding that second step in municipal liability analysis is whether official policymakers' caused the deprivation of rights). The culpability and causation requirements are easily satisfied where the official policymakers with responsibility for the policy at issue themselves are alleged to have intentionally deprived the plaintiff of a federal right or where the action taken or directed pursuant to policy or custom violated federal law. *Id.* at 405, 117 S.Ct. 1382. But, where the plaintiff does not claim that the municipality, through its official policymakers directly caused an injury under § 1983, but rather that the policy caused an employee to violate the plaintiff's feder-

al rights, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.* Thus, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Id.* (citations omitted) (citing and quoting *Canton v. Harris*, 489 U.S. 378 388–89 & n. 8, 109 S.Ct. 1197, 103 L.Ed.2d 412).[17] Indeed, the constitutional injury must be the "plainly obvious consequence" of the municipal decision. *Id.* at 412–13, 109 S.Ct. 1197.[18] Only if the plaintiff make the requisite showing of either a custom or policy *and* causation and culpability may he survive summary judgment.

With the law of § 1983 municipal liability in mind, the Court turns to Izquierdo's asserted basis for the City's § 1983 liability.

### b. § 1983 Liability of the City of Wilmington

The basis upon which Izquierdo asserts municipal liability is somewhat murky. In his Answering Brief, Izquierdo asserts that the "custom or policy is that the Defendant Chief [Pratcher] runs the WPD disciplinary process." D.I. 44, at 15. Izquierdo asserts that there "is a dichotomy of internal authority within the police department that ignores the written rules and regulations and instead offers its own unwritten streamlined procedures.... " *Id.* Izquierdo clarified at oral argument that he was not alleging that any of the written policies of the City of Wilmington, the Directives and/or the C.B.A., violated his due process rights. Rather, he argues that Pratcher created a customs at variance with or outside of those written policies.[19] As support for the conduct by Pratcher rising to the level of custom, Izquierdo points to 1) interpretation of the rules for notice "outside of normal everyday meaning"; 2) automatic termination of an officer after a Hearing Board recommendation; 3) approval of appeals of Hearing Board decisions by the Chief absent an express requirement; 4) "self avowed ultimate responsibility for the WPD"; 5) knowledge of ongoing internal investigations including knowledge of charged officers changing the statements they give during internal investigations; 6) determining the sufficiency of evidence

17. Thus, for example, where a plaintiff alleges a municipality failed to train its police officers, the Third Circuit Court of Appeals has applied a three-part test to determine whether the municipality was "deliberately indifferent" to the constitutional rights of the plaintiff in its training policies: 1) the policymakers know the officers will confront a particular situation; 2) that situation involves a difficult choice or a history of employee mishandling; and 3) the wrong choice in such a situation will frequently cause a deprivation of constitutional rights. *Carter v. City of Philadelphia*, 181 F.3d 339 (3rd Cir.1999), 1999 U.S.App. LEXIS 8101.

18. Prior to the Supreme Court's decision in *Brown*, the Third Circuit Court of Appeals endorsed the following formulation for causation: " 'a sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom.' " *Bielevicz*, 915 F.2d at 851 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir.1987)). *Brown* has seemingly undercut the *Bielevicz* standard since the "plausible nexus" or "affirmative link" standard for causation is arguably lower than the "direct causal link" requirement articulated by the Supreme Court in *Brown*. However, the Court need not resolve this issue, because it would reach the same result under either standard. *See infra* Part III.A.1.b.

19. At oral argument, counsel for Izquierdo further clarified that he was not alleging that any of the other individuals referenced in the Counts alleging constitutional violations by the City of Wilmington were policymakers. Rather, all the constitutional violations alleged against the City were the result of Pratcher deviating from the formal policies of the municipality.

OPS garnered to overcome Izquierdo's 30-day argument; 7) "knowledge and acquiescence of placing Plaintiff on administrative duty after another officer changed his departmental information, without a hearing, and presumption of Plaintiff's lack of veracity"; and 8) allowing Izquierdo to "wait 67 days for an APB". D.I. 44, at 15–16. The evidence adduced by Izquierdo in support of his allegations that Pratcher ran the disciplinary process to the point where his practices superseded the written policies of the department and became a custom cannot support a finding that the City is subject to municipal liability for the alleged § 1983 violations of its officers.

i. Locating the Official Policymakers

■ As discussed at great length above, liability may attach to a municipality if the alleged constitutional injury was caused either by the decision or action of an official policymaker acting in an area in which he had final decision making authority or by acts taken pursuant to official policy. *Jett*, 491 U.S. at 736, 109 S.Ct. 2702; *Pembaur v. City of Cincinnati*, 475 U.S. at 480, 106 S.Ct. 1292; *id.* at 481, 106 S.Ct. 1292 (Brennan, J., plurality opinion). As clarified at oral argument, Izquierdo does not contend that Pratcher acted pursuant to official municipal policy; rather, he contends Pratcher acted pursuant to rules other than those established by the written policies. Thus, if Pratcher were the official policymaker with respect to the areas cited by Izquierdo, the actions and patterns to which Izquierdo points would be official policies of the municipality. However, Izquierdo has not shown Pratcher had final policymaking authority with respect to any aspect of the alleged activities.

The disciplinary process is governed by three principal sources: 1) the Delaware Law Enforcement Officers' Bill of Rights

("Bill of Rights"), 11 Del.C. § 9200 *et seq.*; 2) the Collective Bargaining Agreement between the City of Wilmington and the Fraternal Order of Police ("FOP") Lodge # 1 (C.B.A.), A–359 to A–390; and 3) the Wilmington Police Officer's Manual, Including Directives ("Manual"), A–396 to A–418, A–457 to A–467 (setting forth portions relevant to this matter), which sets out internal WPD regulations and policies. The Court will look to these sources to determine who has final policymaking authority for the City with regard to the disciplinary process. *See Jett*, 491 U.S. at 737, 109 S.Ct. 2702; *Bailey*, 1997 WL 736885, at *4.

The Bill of Rights was promulgated by the Delaware State Legislature and approved by the Governor of Delaware. Pratcher had no power to unilaterally change policy established by the Bill of Rights.[20] *Bailey*, 1997 WL 736885, at *4.

Similarly, Pratcher was not a final policymaker with respect to the Manual. All the direction in the Manual, including the directives dealing with General Conduct and the Administration of Discipline, are reviewed and approved by the Accreditation Manager, the Chief of Police or his designee, the City of Wilmington Law Department, and the Administrative Review Board. Directive ("Dir.") 6.0(a)(3), A–459. Furthermore, publication of information relative to departmental policy requires permission of the Chief of Police or his designee and approval by the Director of Public Safety. Izquierdo does not suggest the Manual itself caused any violations, but suggests that deviations from the manual caused him constitutional injury. However, Pratcher, although a participant in the policymaking process of the Manual had no authority to unilaterally change the Manual. Thus any actions he allegedly

---

**20.** Pursuant to 11 Del.C. § 9203, disciplinary hearings are governed by the Bill of Rights "unless a contractual disciplinary grievance procedure executed by and between the agency and the bargaining unit of that officer is in effect, in which case the terms of that disciplinary grievance procedure shall take precedence and govern the conduct of the hearing." Thus, the C.B.A. could supplant portions of the Bill of Rights. However, as discussed below, Pratcher was not the final policymaker as to the Bill of Rights.

took in contravention of the language of the Manual did not establish a new municipal policy but would be contrary to the written policy. *Sturgess v. Negley*, 761 F.Supp. 1089, 1098 (D.Del.1991) (where two members of a body which had final decision making authority unilaterally took action not as a part of the entire decision making body, action was not attributable to the municipality); *see also Praprotnik*, 485 U.S. at 123, 108 S.Ct. 915 (plurality opinion) (action must be by a *final* decisionmaker); *id.* at 139–40, 108 S.Ct. 915 (Brennan, J., concurring) (same).

Finally, the C.B.A. was entered into between the City of Wilmington and the FOP. To be ratified, the C.B.A. was signed by the Mayor, C.B.A., A–390, and approved by the City Council, C.B.A., A–359. Again Pratcher did not have final policy-making authority.

From what has been said, it is obvious the City had in place written policies governing the disciplinary process which Pratcher did not have authority to alter. Indeed, Izquierdo alleges Pratcher established rules or practices in contravention of those written policies. However, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinates departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 (O'Connor, J., plurality opinion); *accord id.*, at 141–42, 108 S.Ct. 915 (Brennan, J., concurring); *Pembaur*, 475 U.S. at 481–82, 106 S.Ct. 1292 (Brennan, J., concurring); *Bailey*, 1997 WL 736885, at *3. Thus if Pratcher created rules in contravention of the Manual, C.B.A. and Bill of Rights, his actions did not create policy attributable to the City. Therefore, Izquierdo can locate no policy attributable to the City, and, must, instead, locate a custom.

ii. Custom Attributable to the City of Wilmington

To show the constitutional violations Izquierdo alleges were pursuant to a custom of the City, Izquierdo must show that the "given course of conduct is so well-settled and permanent as virtually to constitute law." *Bielevicz*, 915 F.2d at 850; *accord Beck*, 89 F.3d at 971. Alternatively, he may show the final policymakers in the area knew of and acquiesced in the particular course of conduct. *Beck*, 89 F.3d at 971; *Fletcher*, 867 F.2d at 793. The Court will look first to the facts adduced to support Izquierdo's assertion that a general custom of Pratcher running the disciplinary process in contravention of the department's written policies existed, and then turn to the facts proffered to support the individual allegations he makes in support of that claim, to determine whether the record on summary judgment contains a material issue of fact regarding the existence of a municipal custom.

(a) Was there a Custom Attributable to the City of Pratcher Running the Disciplinary Process?

 Izquierdo has not adduced sufficient facts to support his claim that a custom of Pratcher running the disciplinary process existed. Viewing the facts in the light most favorable to him, Izquierdo cannot point to the existence of a material dispute of facts on this issue which would allow him to survive summary judgment.

To support his theory Pratcher runs the WPD's disciplinary process in contravention of the written policies of the City, Izquierdo cites to the deposition testimony of Mayor James H. Sills. However, the testimony to which he points demonstrates only that the Mayor did not interfere, as a general matter, with Pratcher's administration of the disciplinary process. Sills testified he allowed the Chief of Police to run and manage the day-to-day operations of the WPD. B–4. However, Sills also testified that he maintained oversight responsibility for operational procedures. B–4. With specific reference to police discipline, Sills testified he would "allow the department to go through with [the] administrative and disciplinary process." B–4. Taken in the light most favorable to Izquierdo,

the testimony Izquierdo cites for the broad proposition that Pratcher runs the disciplinary process in reality stands only for the unremarkable proposition that Pratcher, as Chief of Police, ran the day-to-day operations of the department, including the disciplinary process, under the supervision of the Mayor and that the department as a whole was allowed to follow an "administrative or disciplinary process." The Mayor's testimony does not suggest that Pratcher's word supplanted that of the Manual, the C.B.A. or the Bill of Rights.

Moreover, assuming for the moment that Izquierdo's other examples of the custom or policy of Pratcher running the disciplinary apparatus have the evidentiary support required to survive a motion for summary judgment, the sum of the examples does not establish the existence of a "custom" which has the force of law of Pratcher "running" the disciplinary process. First, Izquierdo cites Pratcher's "self avowed ultimate responsibility for the WPD." Assuming Pratcher does indeed have ultimate responsibility for the WPD, this point, at best, demonstrates Pratcher has final accountability for the things which occur in the WPD. It does not show a custom of Pratcher running the disciplinary process in contravention or outside the bounds of the formal policies of the City of Wilmington.

Secondly, Izquierdo points to several "examples" specific to this case: evaluating the sufficiency of OPS evidence in order to overcome the 30–day rule; knowledge and acquiescence in placing Izquierdo on administrative duty after another officer changed his Departmental Information; and standing idly by when Izquierdo had to wait an alleged 67 days before the second Appeal. However these events do not support the proposition that Pratcher runs the disciplinary process; rather they support the proposition that Pratcher acted in a certain way during Izquierdo's disciplinary process. Moreover, isolated instances of conduct do not create custom

which has the "force of law." *Groman,* 47 F.3d at 637; *Fletcher,* 867 F.2d at 793.

Finally, Izquierdo points to several "examples" of a custom of Pratcher running the department which represent regular activities by Pratcher allegedly outside the ambit of the C.B.A., Manual and Bill of Rights: automatic termination of an officer after a hearing board recommendation; approval of OPS appeals from hearing board decisions although not required; and knowledge of ongoing internal investigations. However, these instances hardly amount to a custom of Pratcher running the entire disciplinary process. Rather, at most they could show that in some areas, there was a custom of acting outside the authorities governing the disciplinary process.

In total, therefore, Izquierdo has pointed to no evidence which could show a custom attributable to the municipality of Pratcher running the disciplinary process. Therefore, the Court turns to the individual examples to determine if they illustrate any specific customs attributable to the City.

(b) Has Izquierdo Shown the Existence of Any Other Customs Attributable to the City of Wilmington?

Three of the "customs" Izquierdo alleges are attributable to the City cannot, as a matter of law, be customs. In support of his allegations that Pratcher 1) "determin[ed] the sufficiency of evidence OPS garnered in order to overcome Plaintiff's 30 day rule argument"; 2) had "knowledge and acquiescence of placing Plaintiff on administrative duty after another officer changed his departmental information, without a hearing, and presumption of Plaintiff's lack of veracity"; and 3) "allowing Plaintiff to wait 67 days for an APB." D.I. 44, at 16. In each instance, the only support for Izquierdo's allegations that such a custom exists are the single instances which occurred during his own disciplinary process. As already rehearsed, one instance of the custom asserted cannot prove the existence of a custom which has the force of law. *Gro-*

*man,* 47 F.3d at 637; *Fletcher,* 867 F.2d at 793. Therefore, Izquierdo cannot demonstrate these actions were customs attributable to the City for purposes of § 1983 liability.

Similarly, the Court dismisses out of hand any suggestion that Pratcher's alleged "self avowed ultimate responsibility for the WPD", D.I. 44, at 15, could be a custom attributable to the City. Viewed in the light most favorable to Izquierdo, such a statement by Pratcher cannot be seen as a "custom".

■ The Court now turns to Izquierdo's other allegations. First, Izquierdo argues that there exists a custom of "automatic termination of an officer after a CHB recommendation" in contravention of the Manual. D.I. 44, at 16. However, assuming the evidence to which Izquierdo points is sufficient to show a practice of "automatic" termination upon the CHB recommendation,[21] he cannot show that the practice was a custom which existed in contravention of the Manual and the C.B.A. The C.B.A. describes the process of imposing penalty. Pursuant to § 11.7 of the C.B.A., the hearing board will "dictate in a clear and concise manner their recommendation to the Chief as to each count charged, the penalty, if there is one, and their reasoning behind their decision." C.B.A. § 11.7, A–377. Section 11.8 of the C.B.A. requires transmittal of the "decision" to the employee and the Chief of Police on the same day. C.B.A. § 11.8, A–377. Section 11.10 gives the Chief or the Captain of the Internal Affairs division the right to appeal within five days on several grounds, including whether "the penalty *imposed* was too harsh or too lenient." C.B.A. § 11.10, A–378 (emphasis added). The Manual states only that the hearing board, "shall fashion the appropriate punishment," including suspension without pay or dismissal. Dir. 8.7(I), A–408. Taken together, the Manual and the C.B.A. cannot be read in the way Izquierdo urges.

First, and most importantly, the Manual specifically states, without contradiction from the C.B.A., that "Once the decision has been made by a Complaint Hearing Board, the penalty will be imposed, unless appealed, according to departmental procedure." Directive 8.7(N), A–410. This rule is clearly the source for imposition of the penalty as dictated by the CHB, not after review of a recommendation by the Chief. Secondly, the C.B.A., while it does use the word "recommendation" also uses the word "decision" to refer to the action which the hearing board takes. Thus, Izquierdo's reliance on the word "recommendation" is misplaced. Moreover, the Chief of Police may appeal a penalty *imposed.* It follows, the language of the C.B.A. contemplates *imposition* of the penalty by the CHB decision.[22] In addition, the notion that the Chief has to appeal a penalty which is not binding would render nonsensical the entire process. In a similar vein, the Manual requires the hearing board to fashion a punishment which may include "imposing" dismissal or suspension without pay. Directive 8.7(I), A–408. Accordingly, automatic application of the penalty meted out by the hearing board is not in contravention of the Manual and C.B.A. It follows Izquierdo's position that a practice of automatically imposing sentence in contravention of the C.B.A. and Manual exists as a custom attributable to the municipality is without merit.

■ Second, Izquierdo alleges Pratcher approves OPS appeals from hearing board decisions even though such approval

---

**21.** Izquierdo has adduced adequate evidence to support this proposition at this stage. For example, Pratcher stated at his deposition, "That penalty is meted out as a recommendation by the complaint hearing board. It is conveyed to the Chief, and at that point he is told, each officer is told what the penalty is and whether they are terminated or whatever." B–14.

**22.** *Webster's Third New Int'l Dictionary* (1971) defines impose as "to make, frame or apply ... as compulsory, obligatory or enforceable."

is not required by the C.B.A., Manual or Bill of Rights. Defendants concede the C.B.A., Manual and Bill of Rights do not require such approval, and Izquierdo has adduced testimony that the Chief had a custom of approving appeal. *See* Boykin Depo., B–22 (testifying that an appeal "must be through the chain of command, meaning the chief is the one who approves or disapproves the request."). However, because Izquierdo is not claiming the custom of approving appeals was the direct cause of his injury, he must also prove "culpability and causation." *Brown*, 520 U.S. at 405, 117 S.Ct. 1382. The summary judgment record is bereft of any evidence demonstrating culpability and causation. Both culpability, deliberate indifference to Izquierdo's rights to be free from constitutional harm, and causation require that the specific violation is a "plainly obvious consequence," *id.* at 412–13, 117 S.Ct. 1382, or at least the "reasonably probable," *Bielevicz*, 915 F.2d at 851, consequence of the custom. Izquierdo has pointed to no constitutional injury which is the "reasonably probable" consequence of such a custom, much less "plainly obvious." To the extent Izquierdo relies on the charge that he was denied a fair hearing because Pratcher both approved the appeal and did not recuse himself from the appeal board's hearing Izquierdo's case, this injury is not a reasonably probable consequence of the custom. The custom did not dictate that Pratcher ignore the alleged requirements that he recuse himself; his decision not to recuse himself, not a custom attributable to the City, was the cause of the alleged constitutional injury to Izquierdo. Therefore, the custom of approving appeals does not and could not create municipal liability under § 1983.

Finally, Izquierdo argues there existed a custom of the Chief having knowledge of ongoing internal investigations. Arguably, Izquierdo has put forward sufficient facts at this procedural stage to establish the Department had a custom of informing the Chief of ongoing internal investigations, including changes in positions by charged officers. *See, e.g.*, Boykin Depo., B–17 (testifying that as part of chain of command, he would tell the Chief of Police about things "the chief should know about."). However, for the same reasons discussed with respect to approval of appeals, Izquierdo cannot show the requisite culpability or causation. Informing the Chief is not itself a direct constitutional injury. Indeed, a strong argument can be made that a police Chief should be informed of alleged errant conduct by officers under his command. Further, having information about the case does not in itself create any risk of a constitutional violation. To the extent that knowledge of the case meant Pratcher should have recused himself,[23] his alleged failure to recuse when he was allegedly required to do so is not the result of municipal custom. Therefore, this custom does not establish a basis for municipal liability under § 1983. Because Izquierdo has been unable to set forth any facts upon which municipal liability under § 1983 may be based, the Court will grant the City's motion summary judgment on Izquierdo's claims against it.

 Several defendants are named only in their official capacities: Mayor Sills, Dees, Rhohunda, Crowley, Ash, Monaghan and Staats. The Supreme Court has long recognized that, "[o]fficial-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (quoting *Monell*, 436 U.S. at 690 n. 55, 98 S.Ct. 2018). Consequently, in an official capacity suit, the plaintiff must be able to show that the policy or custom of the municipality "played a role in the violation of federal law." *Id.*, at 166, 105 S.Ct. 3099. Where, as here, the plaintiff cannot make such a showing with respect to its claim against

---

**23.** As appears *infra* pp. 415–16, Izquierdo has not adduced any facts to show Pratcher should, as a constitutional matter, have recused himself.

the City, the official capacity defendants must also be dismissed, *see Mancini v. Lester,* 630 F.2d 990, 991 n. 3 (1980) ("[G]overnment officials may be suable in their official capacity for money damages or other monetary equitable relief except where the imposition of such liability would amount to the imposition of respondeat superior liability on a local government not itself suable under the Supreme Court's recent decision in *Monell* . . . ."). Because Izquierdo could not sustain a claim against the municipality under the *Monell* doctrine of municipal liability, the Court also grants summary judgment on all claims against defendants in their official capacities.

## B. Immunity

Defendants next allege that those remaining defendants, Pratcher, Schlecker, Boykin, Howell and Alfree, who are sued in the individual capacities, are either absolutely or qualifiedly immune from liability under § 1983. Because the individually named defendants are all clearly entitled to qualified immunity, the Court does not consider their request that the Court grant them absolutely immunity from the claims in this matter.[24]

### 1. *The Law of Qualified Immunity*

■ Even if all or some of the conduct of the individually named defendants is not

protected, defendants urge that they are entitled to qualified immunity from the § 1983 claims. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Third Circuit Court of Appeals has interpreted subsequent Supreme Court case law to mean that in determining whether qualified immunity protects the officials, the question is "whether a reasonable public official would know that his or her specific conduct violated clearly established rights." *Grant v. City of Pittsburgh,* 98 F.3d 116, 121 (3d Cir.1996). The inquiry must focus on the specific allegations of conduct against the Defendants. The Third Circuit Court of Appeals has explained that "crucial to the resolution of any assertion of qualified immunity is a careful examination of the record . . . to establish, for purposes of summary judgment, a detailed factual description of the action of each individual defendant (viewed in a light most favorable to the plaintiff)." *Id.* at 122.

---

**24.** The Court focuses on the individually named defendants' claims of qualified immunity out of a concern for judicial efficiency, since their entitlement to qualified immunity is obvious, while the issue of absolute immunity is a policy-laden question and their entitlement is not at all clear.

The Court is not unmindful that one of the purposes of absolute immunity is to prevent individuals associated with a judicial or quasi-judicial process from having to question the way they use their necessarily broad discretion. *Butz v. Economou,* 438 U.S. 478, 515, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Ernst v. Child and Youth Services of Chester County,* 108 F.3d 486, 496–96 (3d Cir.1997). It is also aware that by not considering absolute immunity at this juncture, it may force the individually named defendants to carry out their roles in the police disciplinary process while looking over their shoulders. On the other hand,

another consideration the Court would have to consider in making the absolute immunity determination is existence of other avenues through which to supervise the conduct of the defendants and safeguard the rights of the people whom their exercise of discretion might affect. *Butz,* 438 U.S. at 514, 98 S.Ct. 2894; *Ernst,* 108 F.3d at 497. In this case, a grant of absolute immunity might all but eliminate any possibility of redressing the types of flagrant constitutional abuses not shielded by qualified immunity. Accordingly, absolute immunity is far from assured for the individually named defendants.

By not making a determination on absolute immunity, the Court is not ruling the individually named defendants are not entitled to absolute immunity. It is simply determining that this is not an appropriate case in which to make such a determination.

■ The Third Circuit Court of Appeals has established a two-step inquiry to determine whether an individual defendant is immune from suit for monetary damages for the particularized conduct. First, the Court "must determine 'whether the plaintiff has alleged a deprivation of a constitutional [or federal statutory] right' . . . which [it] generally cannot 'assume[ ] without deciding.' " *Torres v. McLaughlin,* 163 F.3d 169, 172 (3d Cir.1998) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, —— n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), and *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). After determining whether the conduct alleged constitutes a violation of a federal constitutional or statutory right, the Court then considers whether that right was clearly established at the time of the alleged violation. *Torres,* 163 F.3d at 172; *Grant,* 98 F.3d at 122.

Because all of Izquierdo's § 1983 claims rest on the claim that he was deprived of various property interests associated with his employment without the procedural due process required by the Fourteenth Amendment, the Court will first turn to the law of procedural due process. The Court will then turn to whether the facts adduced by Izquierdo show a deprivation of a federal constitutional or statutory right.

### 2. Procedural Due Process

■ The Fourteenth Amendment prohibits the taking of property without due process of law.[25] Accordingly, the first step in resolving a procedural due process claim is determining whether the plaintiff was deprived of a property interest. *American Manufactures Mutual Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999); *Sanguigni v. Pittsburgh Board of Public Education,* 968 F.2d 393, 401 (3d Cir.1992) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 569–570, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The

Supreme Court has long held that "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process." *Gilbert v. Homar,* 520 U.S. 924, 928–29, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997).

■ Whether a plaintiff has a property interest is a matter of state law. *Larsen v. Senate of the Commonwealth of Pennsylvania,* 154 F.3d 82, 92 (3d Cir. 1998). A contract which establishes that it may be terminated only for cause may create a property interest in continued employment. *Sanguigni,* 968 F.2d at 401. The C.B.A. created a cognizable property interest in that continued employment. It is therefore not surprising that the parties do not dispute Izquierdo has a property interest in continued employment. *Cf.Fraternal Order of Police v. Tucker,* 868 F.2d 74, 79 (3d Cir.1989) (parties conceded police officers in collective bargaining agreement had cognizable property interest in positions as police officers); *Copeland v. Philadelphia Police Dept.,* 840 F.2d 1139, 1144 (3d Cir.1988) (same). However, the Supreme Court has "not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." *Gilbert,* 520 U.S. at 929, 117 S.Ct. 1807.

■ The second step in a procedural due process analysis is a determination of what process is due to a person deprived of a property interest. *Id.* The Supreme Court has repeatedly stressed that "[d]ue process, unlike some legal rules is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* (quoting *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)) (internal quotations omitted). Accordingly, in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18

---

**25.** That Amendment also protects against the taking of life or liberty without due process.

However, Izquierdo has asserted only a property deprivation.

(1976), the Supreme Court developed a three-part balancing test to determine whether the procedures provided to a plaintiff are constitutionally sufficient:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893; *accord Gilbert,* 520 U.S. at 930–34, 117 S.Ct. 1807 (reciting and applying *Mathews* test). While due process is a flexible and context sensitive concept, *Gilbert,* 520 U.S. at 930, 117 S.Ct. 1807; *Mathews,* 424 U.S. at 334, 96 S.Ct. 893, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). To that end, it is an enduring concept of due process jurisprudence that "due process requires an impartial decisionmaker before final deprivation of a property interest." *McDaniels v. Flick,* 59 F.3d 446, 459 (3d Cir.1995). However, the nature and time of that impartial decision making are flexible. *See id.*

With the principles of qualified immunity and procedural due process in mind, the Court turns to evaluation of Izquierdo's § 1983 claims against the individual defendants and their assertions of qualified immunity.

**26.** Izquierdo explained his theories and linked the facts on the record to those theories for the first time at oral argument. At that time, the Court made clear that it was asking Izquierdo to articulate *all* those theories and facts. Since the case was removed to District Court almost two years ago, discovery has been complete since December 1998 and briefing on this present motion completed

### 3. *Individual Liability*

Because the determination of qualified immunity is context sensitive, *Grant,* 98 F.3d at 122, the Court will look in turn at each theory of liability of the individually named defendants which Izquierdo posits and the facts which he urges support those theories.[26]

#### a. Pratcher

█ At oral argument, Izquierdo articulated three theories of individual liability for Pratcher. First, he claims Pratcher was biased and denied Izquierdo a fair and impartial hearing by failing to recuse himself from the Appeal Board. Secondly, Izquierdo alleges Pratcher denied him due process by allowing the CHB to automatically dismiss him without reviewing the facts. Finally, he alleges Pratcher denied him due process by not holding the Second Appeal Board until August 27, 1996. The Court reviews each theory in turn.

As evidence of Pratcher's bias, Izquierdo points out Pratcher was informed of the ongoing internal investigation. Indeed, Boykin testified that as part of the chain of command, Pratcher was informed about parts of the investigation, including changes made to the Departmental Informations filed by Officers S and J in conjunction with the internal investigation. In addition, as already rehearsed, Ayala testified at his deposition that he believed Howell discussed the case with Pratcher. However, the uncontradicted evidence is that Pratcher did not make the decision to appeal the decision of the First CHB and that his signature on the first appeal was routine. Izquierdo has not, and cannot, adduce any further facts in support of his claim that Pratcher was biased.[27]

since April 21, 1999, this request was not onerous. Izquierdo has limited himself to theories and facts cited in support of those theories as he articulated at oral argument.

**27.** The record contains a letter in which counsel for Izquierdo opined that Pratcher had "at least subjectively, lost any vestige of impartiality that would be required to sit on the

Procedural due process requires that before an individual is finally deprived of a property interest, he receive an impartial hearing. *McDaniels*, 59 F.3d at 459. Izquierdo has not shown the deprivation of that right to overcome Pratcher's assertion of qualified immunity at the summary judgment stage. Izquierdo has not adduced any facts to show Pratcher was not impartial. At best, he has shown that Pratcher had knowledge of the case before he heard it and routinely signed-off on an appeal. The facts on the record do not show Pratcher had any predisposition for or against Izquierdo. Indeed, Izquierdo has not pointed to any place in the record which indicates the Pratcher's knowledge of the case had any impact on the result he reached. At best, Izquierdo presents angry allegations and bald-face assertions to support his claim that Pratcher's presence on the Appeal Board deprived him of an impartial hearing. In short, Izquierdo has not defeated Pratcher's assertion of qualified immunity with respect to the claim that Pratcher deprived him of a fair and impartial hearing.

■ The termination went into effect immediately upon the ruling by the CHB without review of the facts by Pratcher. Pratcher testified that a ruling of termination by CHB generally served as the officer's notification of that termination. He further testified that he would generally give verbal approval when he was noti-

fied of the CHB decision and would then approve a written follow-up. Taken in the light most favorable to Izquierdo, these facts could be construed to indicate Pratcher automatically allowed imposition of any CHB penalty without review of the evidence. However, as this Court has already ruled, the C.B.A. and the Manual do not require Pratcher to review CHB decisions and penalties before their imposition. The decision of the CHB does not require approval by the Chief. The failure by Pratcher to review the facts before signing off on or implementing the decision of the Second CHB cannot be a violation of Izquierdo's procedural due process rights if he was not required to do so by the formal written policies governing the police disciplinary process.[28]

■ Finally, Izquierdo has not produced a single shred of evidence to support his allegation that Pratcher violated his constitutional due process rights by allowing the Second Appeal Board to be held 67 days after the decision of the Second CHB. For the proposition that Pratcher allowed plaintiff to wait 67 days, Izquierdo cites to the deposition testimony of Pratcher and Boykin. However, neither of those depositions provide a scintilla of fact in support of Izquierdo's assertion that Pratcher allowed the hearing to be held 67 days after the Second CHB reached its decision. At his deposition, Pratcher reviewed the tim-

Appeal Board." A–341. In that letter, counsel for Izquierdo provides his interpretation of Pratcher's attitude toward the matter. This letter is not germane for two reasons. First, counsel for Izquierdo failed to raise the letter when the Court asked to cite *all* the facts supporting his theories of liability for his § 1983 claims against the individually named defendants. More significantly, the opinion of Izquierdo's counsel would be inadmissible at trial. *See* Fed.R.Evid. 701 (limiting opinion testimony of non-experts); D.Del.L.R. 83.6 (binding attorneys to Model Rules of Professional Conduct of the American Bar Association); A.B.A. Model R. 3.7 (barring an attorney in a case from acting as a witness); *see also Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 103 (3d Cir.1999) (considering only those facts which can be proved by

admissible evidence in ruling reviewing *de novo* district court's summary judgment decision). Izquierdo has failed in his burden to produce any further admissible facts in support of his assertion that Pratcher was biased. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint.").

**28.** As already rehearsed, Izquierdo does not allege the procedures set out by the C.B.A. or Directives violated his due process rights. Rather his theory is that by failing to follow or going outside the C.B.A. and the Directives, Pratcher violated his rights to procedural due process.

ing of the Second CHB and Second Appeal Board with counsel and then testified that there was "probably" a reason why the Second Appeal Board did not convene sooner but "I couldn't tell you what it is." B–14. Pratcher further testified that OPS, not he, was responsible for scheduling Appeal Boards. Boykin's testimony is that the timing was not "unreasonable," and that he did not know the reason for the delay. B–26.

Other evidence in the summary judgment record also fails to support Izquierdo's allegation that Pratcher allowed the Second Appeal Board to be convened 67 days after the Second CHB reached its decision. The only evidence on the record presented to the Court that Pratcher had any notice whatsoever of the scheduling issue are two letters copied to him. On July 19, 1996, counsel for Izquierdo sent a letter to Howell and Staats and copied Pratcher, stating "It is my understanding at this time that the Appeal Board has not yet been configured nor convened. Please notify me when it has been and a date set." A–328. A letter to Dees, copied to Pratcher, from Izquierdo's counsel dated August 13, 1996, mentions that the Second Appeal Board had been scheduled for August 27, and that "we do not acquiesce nor consent to the long delay caused by the Wilmington Police Department." A–337. Nothing on the record suggests Izquierdo ever asked Pratcher to expedite scheduling. Indeed, Izquierdo has adduced absolutely no fact suggesting Pratcher had the power to order a change in schedule or shorten the period of time between the CHB determination and the appeal. Izquierdo has not shown that Pratcher's conduct caused him "a deprivation of a constitutional [or federal statutory] right." *Torres*, 163 F.3d at 172; *accord Grant*, 98 F.3d at 121–22 (holding inquiry must focus on "whether a reasonable public official should know that his or her specific conduct violated clearly established rights.").[29]

### b. Schlecker

■ With respect to Schlecker, Izquierdo asserts she violated his due process rights in two ways. First, he argues she put forward a "false argument" about the power of the CHB to terminate an officer without wages before the appeal process was completed, without review by the Chief. Second, he argues she gave false arguments to OPS regarding the sustainability of its case in light of the 30–day rule.[30] Schlecker is entitled to qualified

---

**29.** Even if Izquierdo could show it was Pratcher who allowed the Second Appeal Board to be scheduled 67 days after the CHB determination, Izquierdo still would not have alleged a deprivation of a constitutional right. Under the analysis required by *Mathews* and its progeny, there is no due process right to an appeal in less than 67 days. First, Izquierdo has not shown procedural due process requires he have an appeal from the initial determination of the CHB. Second, assuming he was entitled to a post-termination hearing, a comparison of the Izquierdo's interest in a quick appeal after an otherwise final CHB decision with the government's interests in having flexibility in the timing of the appeal as required by *Mathews*, makes clear that the incremental benefit to be gained by having a more rapid appeal cannot match the cost to the government of setting a narrower time line for appeals. If, for example, scheduling conflicts or pressing matters, such as a city-wide emergency arose and OPS was unable to schedule an Appeal Board within the allotted time, it would risk being forced to reverse disciplinary decisions and employ officers who were potentially a danger to their fellow officers or the citizenry of Wilmington. Accordingly, the balance weighs heavily in favor of the interests of the WPD.

Indeed, the Supreme Court held that where an individual whose job did not implicated the public safety was suspended from his job in deprivation of his property interest in employment, a period of 90 days to hear the case and render a decision would not violate due process. *Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 108 S.Ct. 1780, 1789, 100 L.Ed.2d 265 (1988).

**30.** At oral argument, when listing his client's claims against the individual defendants, counsel for Izquierdo did not explicitly state that Schlecker's decision to grant a *nolle prosequi* to the civilian complainant put in doubt Izquierdo's veracity and biased the civilian complainant against Izquierdo at his hearing violated his due process rights. However,

immunity from liability under either theory.

In response to a letter to Schlecker from counsel for Izquierdo, Schlecker told Izquierdo that Directive 8.7(N) of the Manual[31] does not prohibit imposition of a trial board penalty until after the appeal process was completed. She further told him that the Directive had never been so interpreted because such an interpretation might cause personal safety issues. She further pointed out that if the Appeal Board reversed the decision of the CHB, Izquierdo would have the opportunity to apply for back pay.

The record contains no evidence which demonstrates Schlecker caused Izquierdo the alleged constitutional deprivation. The letter Schlecker wrote to counsel for Izquierdo recites her understanding of the Directives. However, there is absolutely no evidence on the record indicating Schlecker was responsible for determining that Izquierdo should be terminated pending appeal pursuant to the decision of the Second CHB.

■ Second, even if Izquierdo could show Schlecker's position regarding Directive 8.7(N) was false, and could further show her interpretation caused him to be terminated pending appeal, these actions did not deprive him of the procedural due process to which he was entitled. In applying the three-factor balancing test, it is clear that termination pending appeal does not violate an officer's due process rights. Because an officer may collect back-pay if his termination is reversed by the Appeal Board, he has little or no property interest at risk. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893. It is true, waiting until after appeal to implement the determination of the CHB would eliminate the risk of erroneous deprivation. *See id.* However, the government interest in protecting the safety of its officers, the discipline of its police force and the safety of its citizenry far outweigh the risks of an erroneous deprivation to Izquierdo. Requiring police departments to wait to implement disciplinary proceedings pending appeal would force these departments to allow officers who are disruptive to internal discipline or dangerous to the public to go about their duties. Given the balance of factors, the Court finds there is no due process right to a pretermination appeal.[32] Because

because counsel for Izquierdo mentioned the decision to *nolle pros.* several times during the course of oral argument, an abundance of caution leads the Court to note that Schlecker is entitled to qualified immunity regarding this claim as well. First, Izquierdo can point to no fact which would suggest the *nolle pros.* caused either WPD officials or the civilian complainant to doubt or dislike Izquierdo. Rather, prior to the *nolle pros.*, two of Izquierdo's fellow officers had changed their statements to conflict with his. Further, the civilian complainant had accused Izquierdo of beating him. The notion that without the *nolle pros.* the complainant would not have sided with the OPS is patently absurd.

Second, the notion that a prosecutor cannot grant a *nolle pros.* when advised that one or more officers might perjure themselves without violating the due process rights of any officers under investigation for the same events is wholly without merit. Applying the *Mathews* test, the interest of Izquierdo and others similarly situated in such a bar is minimal, especially given the existence of other procedural safeguards, including an opportunity to cross-examine the complainant. How-

ever, the interest of the government in preventing a perjury-laden prosecution is vast. Therefore, Izquierdo cannot possibly make a showing that the *nolle pros.* in any way caused a constitutional violation, and Schlecker is entitled to qualified immunity against such a claim.

**31.** Directive 8.7(N) states, "Once the decision has been made by a Complaint Hearing Board, the penalty will be imposed, unless appealed, according to departmental procedure." A–410.

**32.** Indeed, the WPD provided Izquierdo with the procedures required by the Supreme Court in similar situations, if not more. For example, in *Cleveland Board of Ed. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that a tenured public employee is entitled to a "pretermination opportunity to respond, could with post-termination administrative procedures." *Id.* at 547–48, 105 S.Ct. 1487. In particular, an employee with a property interest in continued employment is entitled

Izquierdo cannot show Schlecker's argument about Directive 8.7(N) caused him a constitutional deprivation, Schlecker is immune from suit for that conduct.

Izquierdo's second argument, that Schlecker caused OPS to forward "false arguments" regarding the 30–day rule need not detain the Court. Assuming for the moment that Schlecker did indeed encourage such "false arguments," Izquierdo cannot show such conduct caused him a constitutional deprivation. At worst, Schlecker's alleged conduct caused the First Appeal Board to interpret the 30–day rule in a way which did not favor dismissal of the charges against Izquierdo. However, Izquierdo has conceded he had no due process right to compliance with the provisions of the 30–day rule.[33] It follows, Schlecker cannot be said to have caused him any *constitutional* harm by virtue of her alleged conduct. It follows, she is immune from suit on this theory as well.[34]

### c. Boykin

Izquierdo asserts Boykin violated his constitutionally protected right to procedural due process in two ways. First, he argues that by informing Pratcher about the progress of the investigation, he "tainted" him. Second, Izquierdo argues Boykin presumed Izquierdo lacked credibility and placed him on administrative duty in violation of his right to due process.

While the record indicates Boykin did inform Pratcher about the investigation as part of the chain-of-command, Boykin's conduct did not violated Izquierdo's constitutional rights. As already rehearsed, there is not one shred of fact on the record to suggest Pratcher was "tainted" merely by having knowledge. Pratcher's presence on the Appeal Board did not deprive Izquierdo of his right to an impartial hearing for the reasons upon which the Court has already elaborated. Therefore, with respect to his communications with the Chief, Boykin is immune from suit under § 1983 for this conduct.[35]

to notice, an explanation of the employer's evidence and an opportunity to present "his side of the story". *Id.* at 546, 105 S.Ct. 1487. Here, Izquierdo had notice, an explanation of the WPD's evidence and an opportunity to respond. In addition, he had the opportunity to make legal arguments about the procedural sufficiency of his case and to cross examine witnesses against him. Post-termination, he had further administrative proceedings in the form of the Appeal Board.

33. In briefing, Izquierdo suggested the interpretation of the 30–day rule presented by OPS to the CHBs and Appeal Boards violated his right to notice because it was an "unwritten policy." However, he presents no evidence to suggest the arguments made at the CHBs and Appeal Boards were anything more than just that—legal arguments. The notion that due process requires notice of all legal arguments, or even "policies" of interpretation which an adversary will forward at a hearing, is without merit. In a case such as this one, where there is no constitutional right to the rule being interpreted, the risk to private interests is the minimal risk of surprise at the interpretation forwarded. Requiring that all policies be written would not minimize this risk since writing is also open to interpretation. And the governmental interest at stake is the high

cost of writing each policy, and the risk that a new interpretation of any policy will be considered an unwritten policy. In light of the three *Mathews* factors, the Court cannot say there is a due process right to notice of all agency policies of interpretation.

34. The same is true regarding Izquierdo's allegation that Alfree argued an unwritten policy regarding interpretation of the 30–day rule, his allegation that Howell changed his testimony in relation to the timing of Staats' report for purposes of the 30–day rule and his allegation that Boykin instructed Howell and Staats to make arguments of unwritten policy regarding the 30–day rule. Because there is no constitutional right to Izquierdo's interpretation of the 30–day rule, or to a "written policy" regarding this interpretation, any conduct which interfered with Izquierdo receiving the benefit of his preferred interpretation is not conduct which deprived Izquierdo of a constitutional right. It follows Izquierdo cannot defeat the qualified immunity asserted by Boykin, Alfree and Staats with respect to their roles in presenting arguments concerning the 30–day rule to the CHB and Appeal Board.

35. The same is true for Howell with respect to his alleged communications with Pratcher regarding the investigation.

■ The record indicates that after Officers S and J changed the statements they had given and further inculpated Izquierdo, Boykin ordered Izquierdo and Officers S and J placed on administrative duty. Boykin testified the officers were not placed on administrative duty until Officer S changed his story. Boykin's uncontradicted testimony is that he places officers on administrative duty out of a concern that a repeat incident might occur and to protect the officer from multiplying the charges against him while charges are pending. Finally, he testified, also without contradiction, that when civilians complain about the use of force by an officer, he does not order the officer placed on administrative duty, absent "extenuating circumstances." B–19.

Placing Izquierdo on administrative duty without a hearing because he doubted Izquierdo's credibility did not cause a constitutional deprivation. Izquierdo urges he had a property interest in working extra-duty and overtime assignments from which he was prohibited while on administrative duty. However, he had no property interest and therefore cannot claim due process protection in this instance.

The Supreme Court has "not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." *Gilbert,* 520 U.S. at 929, 117 S.Ct. 1807. Assuming that property interest does extend to discipline other than termination, Izquierdo has not shown a property interest in the assignments from which he was prohibited while on administrative duty. A C.B.A. may create a property interest in employment. *See Sanguigni,* 968 F.2d at 401. In this case, the parties do not dispute Izquierdo had a property interest in continued employment under the C.B.A. However, the C.B.A. does not create a property interest in working extra-duty or overtime. In fact,

Article 15, section 15.1 of the C.B.A. prohibited an employee from working "extra-duty" jobs without first obtaining approval. The C.B.A. governs extra-duty jobs, but does not guarantee them. Similarly, Article 17, section 17.1 limits the amount of overtime the Chief can assign when he changes shifts and section 17.2 guarantees heightened compensation when an officer works overtime. However, the C.B.A. does not guarantee an officer will be assigned overtime. It follows, Izquierdo has no constitutionally protected property interest in working overtime or extra-duty jobs, and was therefore not entitled to due process before being placed on administrative duty. Izquierdo, being unable to show that by placing him on administrative duty Boykin deprived him of a constitutional right, cannot overcome Boykin's immunity from suit for that conduct.

Because Izquierdo has not adduced facts demonstrating any of the individual defendants deprived him of a constitutional right by their specific conduct, he has failed to overcome their assertions of qualified immunity. Therefore, the Court will grant the individually-named defendants' motions for summary judgment with respect to Izquierdo's § 1983 claims against them.

## C. Remand

■ Defendants urge the Court to dismiss the state law causes of action pursuant to 28 U.S.C. § 1367(c)(3) [36] after dismissing all of the federal claims. Indeed, all the federal question claims have been dismissed, and numerous state law claims, upon which this Court has never ruled, remain. The Court concludes that in light of the posture of the case, retaining jurisdiction would be inappropriate. While the Court has discretion to dismiss, the Supreme Court has also held that:

> a district court has discretion to remand to state court a removed case involving

---

36. Title 28, section 1367(c) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under

subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction."

pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate. The discretion to remand enables district courts to deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine.

*Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Because the parties have already conducted discovery and substantially briefed the state law issues with regard to defendants' motion for summary judgment, it would be patently unfair to dismiss the claim and require the parties to start from scratch in state court. Therefore, the Court remands the matter to Court of Chancery for further proceedings.

### IV. Conclusion

The Court will grant the motion to dismiss all of Izquierdo's § 1985 and § 1986 claims because Izquierdo concedes he cannot state a claim under those statutes. The Court will grant summary judgment to the City of Wilmington and all defendants in their official capacities on the § 1983 claims because Izquierdo has failed to show he suffered any constitutional deprivations as a result of a municipal custom or practice. The Court will grant summary judgment to all defendants named in the individual capacities on the § 1983 claims because Izquierdo has not made the requisite showing to overcome their assertion of qualified immunity. Finally, because all the federal question claims have been dismissed, the Court remands the matter pursuant to the Supreme Court's decision in *Carnegie–Mellon University v. Cohill.*