David L. JONES, Plaintiff,

v.

CITY OF WILMINGTON,
et al., Defendants.

No. Civ.A. 00–952–KAJ.

United States District Court,
D. Delaware.

Jan. 8, 2004.

J. Michael Johnson, Maron & Marvel, P.A., Wilmington, Delaware, for plaintiff.

Rosamaria Tassone, City of Wilmington Law Department, Wilmington, Delaware, for defendants, City of Wilmington, Wilmington Police Department, James Jubb, Michael Boykin, Rita Crowley, Nancy Dietz, and Martin Donohue.

Seth Jason Reidenberg, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for defendant, Robert Fox.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. Introduction

This is a race discrimination case brought by David L. Jones ("Plaintiff"), an African–American male, against defendants the City of Wilmington, the Wilmington Police Department ("WPD"), Sergeant Robert Fox ("Sgt.Fox"), Captain James Jubb ("Cpt.Jubb"), Chief Michael Boykin ("Chief Boykin"), Captain Rita Crowley ("Cpt.Crowley"), Captain Nancy Dietz ("Cpt.Dietz"), and Captain Martin Donohue ("Cpt.Donohue") (collectively "Defendants"). Presently before the court is a motion for summary judgment (Docket Item ["D.I."] 70) filed by Defendants, a motion to seal the deposition transcript of Plaintiff ("motion to seal") (D.I.65) filed by Defendant City of Wilmington, and a motion to compel answers to interrogatories, production of documents, and the deposition of Officer Dietz ("motion to compel") (D.I.47) filed by Plaintiff. Because the Plaintiff brings this action under 42 U.S.C. §§ 1983, 1985, and 1986, and Title VII of the Civil Rights Act of 1964, the court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. For the reasons that follow, the motion for summary judgment is denied in part and granted in part, and the motion to compel and motion to seal are granted.

### II. Background

Plaintiff was hired by the WPD as a police officer on March 11, 1991, and currently serves in that job. (D.I. 1 at ¶ 19.)

On September 11, 1998, Plaintiff was scheduled to work his normal shift for the WPD beginning at 3:00 p.m., and ending at 1:00 a.m. on September 12. (*Id.* at ¶ 20.) Plaintiff also signed up for an "extra-duty job"[1] on September 12, 1998 to provide security for a private vendor during the Brandywine Arts Festival from midnight to 8:00 a.m. (*Id.* at ¶ 25; D.I. 75 at 3.)

Defendants allege that on the afternoon of September 12, Sergeant Cory Staats ("Sgt.Staats") advised Sgt. Fox, upon relieving him of his extra-duty job assignment at the Arts Festival, that a vendor had approached him and teased him about being caught sleeping on the job. (D.I. 66 at 3.) Unaware of what the vendor was referring to, Sgt. Staats had asked the vendor to explain. (*Id.*) The vendor stated that upon arriving at the Festival grounds in the early morning hours of September 12, a green Ford Expedition was blocking the entrance. (*Id.*) She noticed an individual in the Expedition and flashed her highlights to attract the occupant's attention, but when the vendor did not receive a response, she approached the vehicle and observed a uniformed officer asleep in the front seat. (*Id.*) Sgt. Staats concluded that the officer in question was Plaintiff, and that the vendor had mistaken him for Plaintiff. (*Id.*) Defendants allege that "faced with a potentially serious violation" of the [WPD] Directives, Sgt. Fox took the vendor's complaint and began an official investigation into the specific charge of "Sleeping on Duty." (*Id.* at 3–4.)

On September 19, 1998, Sgt. Fox served Plaintiff with a written "Notification of Complaint" regarding this matter. (*Id.* at 4; D.I. 75 at 4.) On the same date, Plaintiff denied the allegation of "Sleeping on Duty" in a written response called a "De-

---

1. "Extra-duty jobs", i.e. requests from an individual or private firm to hire off-duty police officers to provide security services "are governed by Directive 6.54 of the Wilmington Police Manual." (D.I. 66 at 1, fn. 1.)

partmental Information." (D.I. 66 at 4.) Plaintiff also stated in the Information that, "[o]n 12 Sept 98 this officer worked ground security at the Brandywine Art Festival from 2400—0800 hrs." (*Id.;* D.I. 75 at 4.) Defendants claim that Sgt. Fox discovered, in the course of his investigation, that the end of Plaintiff's regular duty shift and the beginning of his extra-duty job overlapped by one hour, and that Plaintiff had not requested compensatory time from his supervisor, Sergeant Steven M. Thomas ("Sgt.Thomas"), for the final hour of his shift. (*Id.*) Moreover, Defendants assert that Sgt. Fox discovered that Plaintiff's personnel sheet, payroll sheet, and "car sheet" [2] indicated that Plaintiff worked his entire shift, until 1:00 a.m. (*Id.*)

In an effort to ascertain the exact time Plaintiff arrived at the Arts Festival, Sgt. Fox, according to Defendants, reviewed a report showing the times and locations Plaintiff utilized his access card within the police station, and also reviewed Plaintiff's radio and telephone transmissions between the hours of midnight and 8:00 a.m. on September 12, 1998. (*Id.* at 4–5.) The access card report shows that Plaintiff entered the building at 12:14 a.m., 12:16 a.m., and 12:17 a.m. (*Id.* at 5.; D.I. 1 at ¶ 28.) Defendants assert that the only transmission from Plaintiff during the time in question occurred at 12:14 a.m., when he advised the WPD radio room dispatcher that he was finished with his last assignment and was "en route" to the police station.

(*Id.*) Based on the time of Plaintiff's radio dispatch and the time Plaintiff entered the building with his access card, Defendants concluded that Plaintiff was actually at the back door of the police station when he told the dispatcher that he was "en route to Central." (*Id.*)

Plaintiff claims that he submitted a one-hour "comp" slip for the overlapping hour on September 9, 1998. (D.I. 1 at ¶ 20.) Plaintiff also claims that Sgt. Thomas excused him after midnight on September 12, so that he could get to his extra-duty job, and told Plaintiff to give him an excused slip [3] for the regular duty time.[4] (D.I. 75 at 3.) Furthermore, in his rush to get to his extra-duty job, Plaintiff claims that he erroneously transmitted that he was "en route" to the station instead of that he had arrived at the station. (*Id.* at ¶ 25.) Finally, Plaintiff claims that after being excused by Sgt. Thomas at 12:30 a.m., he left for the extra-duty job and arrived at the Arts Festival prior to 1:00 a.m. (D.I. 1 at ¶¶ 29–30.) [5]

On December 2, 1998, Sgt. Fox served Plaintiff with a second "Notification of Complaint" regarding his investigation into potential violations of WPD Directives, and asked him to clarify the time he arrived for work at the extra-duty job at the Arts Festival. (D.I. 1 at ¶ 31; D.I. 66 at 6.) Plaintiff alleges that he "corrected" the statement he made in the September 19, 1998 Departmental Information by filing

**2.** "A 'car sheet' refers to a log maintained by officers while on duty. Officers record all activity on the form, including the time spent on each assignment." (D.I. 66 at 4.)

**3.** According to Plaintiff, an "excused slip is used when a sergeant excuses a patrolman from up to two hours of work without it coming off his accumulated time." (D.I. 75 at 3.)

**4.** Defendants admit that Sgt. Thomas produced a Leave of Absence Form, signed by

Plaintiff, requesting an hour off on September 12 from 12:00 a.m. to 1:00 a.m., but note that Sgt. Thomas did not recall when Plaintiff submitted the form and that the form did not indicate supervisory approval. (D.I. 66 at 6.)

**5.** The access card report does not indicate when Plaintiff left the station because an access card is not utilized when an officer exits the police station. (D.I. 66 at 5.)

another Information on December 2 in which he stated that he arrived at the Arts Festival "close to" 1:00 a.m. on September 12, 1998. (D.I. 75 at 4; D.I. 66 at 6.) At the close of his investigation, Sgt. Fox concluded that Plaintiff was not truthful and forthright when he wrote in the December 2 Information that he arrived at his extra-duty job at approximately 1:00 a.m. on September 12, that Plaintiff was not truthful and forthright when he submitted a "car sheet" stating that he had worked his regular duty assignment until 1:00 a.m., that Plaintiff was not truthful and forthright when he made the radio transmission that he was "en route" to the police station, and that Plaintiff violated WPD Directives 7.3(D), Dishonesty, and 7.6(J), Failure to Patrol. (D.I. 1 at ¶ 32; D.I. 66 at 6–7.) As a result, the WPD charged Plaintiff with three counts of Dishonesty and one count of Failing to Properly Patrol. (*Id.*)

The Office of Professional Standards convened a Complaint Hearing Board on March 11, 1999 to adjudicate the charges. (D.I. 1 at ¶ 38.) The Hearing Board found Plaintiff guilty on two counts of dishonesty as it related to his radio transmission and written Departmental Informations, reduced the charge of Dishonesty relating to the incorrect time on Plaintiff's "car sheet" to a charge of "Inaccurate Reporting," and found Plaintiff not guilty of violating Directive 7.6(J), Failure to Patrol. (*Id.* at ¶ 39; D.I. 66 at 9.) Under the WPD Directives at the time, which required automatic dismissal for two counts of dishonesty, Plaintiff was terminated. (D.I. 1 at ¶ 40; D.I. 66 at 9.)

Plaintiff appealed the Hearing Board's decision to the Appeals Board, which convened on May 21, 1999. (D.I. at ¶ 46; D.I.

66 at 10.) The Appeals Board reversed the findings of the Hearing Board, reduced one charge of dishonesty to inaccurate reporting, and reduced Plaintiff's punishment from termination to a 10 day suspension. (D.I. 1 at ¶¶ 47–49; D.I. 66 at 10.) Plaintiff was reinstated on May 24, 1999. (*Id.*) Prior to the Appeals Board hearing, Plaintiff filed a Charge of Discrimination with the Delaware Department of Labor and the Equal Employment Opportunity Commission ("EEOC"). (D.I. 1 at ¶¶ 7, 44; D.I. 66 at 10–11.) On August 18, 2000, the EEOC notified Plaintiff, by letter (D.I. 1 at Ex. C), of his right to sue the WPD, and Plaintiff filed his Complaint on November 14, 2000. (D.I.1.)

The Complaint alleges that Defendants have discriminated against Plaintiff based on race, and that Defendants have harassed and retaliated against him after he filed a Charge of Discrimination with the Delaware Department of Labor and the EEOC,[6] all in violation of his constitutional rights. More specifically, the Complaint brings claims pursuant to 42 U.S.C. § 1983 for violations of the Plaintiff's constitutional rights to equal protection of the law, to free speech, and to petition the government for redress of his grievances. The Complaint also alleges violations of Title VII of the Civil Rights Act of 1964, and violations of civil rights protections set forth in 42 U.S.C. §§ 1985 and 1986. (D.I. 1 at ¶¶ 124–155.) Plaintiff seeks special damages, compensatory damages, punitive damages and costs. (*Id.* at 21–22.)

## III. Discussion

### A. Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judg-

---

**6.** Plaintiff's basis for his assertions of retaliation and harassment include, among other things, his assignment to the camera room and a lack of training opportunities. (D.I. 1 at ¶¶ 50–97.)

ment shall be entered if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "[T]he availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id.* at 255, 106 S.Ct. 2505; *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002) (internal quotes omitted).

## 1. Discrimination and Retaliation Claims

Plaintiff alleges that he was subjected to race discrimination in violation of 42 U.S.C. § 1983 and Title VII, 42 U.S.C. § 2000e–2, when Defendants terminated him and retaliated against him for filing a Charge of Discrimination with the Delaware Department of Labor (D.I. 1 at ¶¶ 124–128.) Section 2000e–2 of title 42 reads in relevant part:

(a) Employer practices

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with re-

spect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

■ The United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), set forth a three-step burden shifting analysis for Title VII discrimination and retaliation cases and for § 1983 discrimination claims. *See St. Mary's Honor Society v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (stating that the *McDonnell Douglas* framework applies to both Title VII and § 1983 discrimination claims). First, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. 1817. If that requirement is satisfied, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *See id.* If the employer does so, the burden shifts back to the plaintiff to show the nondiscriminatory reason offered by the defendant-employer was a mere pretext for discrimination. *See id.*

Plaintiff alleges that he was terminated for being charged with dishonesty because he is African–American, and that white and Hispanic police officers in similar situations were treated more leniently. (D.I. 1 at ¶¶ 98–123.) Plaintiff also contends that, after he complained about their discriminatory practices and was reinstated as a WPD police officer, Defendants dis-

criminated and retaliated against him by assigning him to the camera room and limiting his training opportunities. (D.I. 1 at ¶¶ 50–97.) Defendants assert that Plaintiff's allegations do not establish a prima facie case of discrimination because, in order to make out a prima facie case of unlawful discrimination, Plaintiff must show that he: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse job action; and 4) was treated differently than employees who are not members of his protected class. (D.I. 66 at 14; D.I. 78 at 9) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). *See also King v. City of Philadelphia*, Civ. A. No. 99–6303, 2002 WL 1277329 at *9 (E.D.Pa. June 4, 2002) (applying the four-part *McDonnell Douglas* test to a race discrimination claim by a police officer who was terminated from employment), *aff'd* by 2003 WL 1705967, 66 Fed.Appx. 300 (3d Cir. Apr.1, 2003).

Specifically, Defendants allege in their motion for summary judgment that Plaintiff has failed to satisfy the last prong of the test set forth in *McDonnell Douglas* because he has not demonstrated that he was treated differently than non-African-American police officers who were similarly situated. (D.I. 66 at 14; D.I. 78 at 9.) As proof that Plaintiff has not satisfied the fourth element of the test, and thus failed to establish a prima facie case of race discrimination, Defendants argue that Plaintiff compares himself to a number of white officers, and a Hispanic officer, whose circumstances were not sufficiently similar to Plaintiff's circumstances to satisfy the fourth prong of the test. (D.I. 66 at 16–19; D.I. 78 at 9–11.) Defendants argue that those other officers were indeed treated differently, but that any difference is due to a straightforward, non-discriminatory reason, namely that, unlike Plaintiff, those other officers were not charged with multiple acts of dishonesty and deception. (*Id.*)

Plaintiff answers that, even though he was charged with multiple counts of dishonesty, his course of conduct concerned only a single set of events, in effect a single incident, and that he is thus similarly situated to other officers involved in single incidents of dishonesty. (D.I. 75 at 16.) Plaintiff also contends that his being charged with multiple acts of dishonesty arising out of the same incident supports his argument that he was treated differently than the white and Hispanic officers because he had multiple charges "piled on" him. (*Id.*) Furthermore, Plaintiff argues that Defendants' motion for summary judgment is not well founded because it is based on an alleged failure to prove differential treatment while, at the same time, the Defendants are refusing to respond to Plaintiff's interrogatories and document requests seeking evidence of differential treatment. (D.I. 75 at 11.)

■ Plaintiff's last point is persuasive to this extent: he must be allowed a fair opportunity to prove that he is similarly situated to the other WPD officers charged with dishonesty and/or inaccurate reporting, and thus establish a prima facie case of discrimination. It may well be that, as the Defendants assert, the officers to whom the Plaintiff compares himself were charged with dishonesty under circumstances so different as to defy any claim that the Plaintiff and those officers could be considered "similarly situated" for purposes of a racial discrimination analysis. It may also be, however, that there is merit to the Plaintiff's claim that the leveling of multiple charges against Plaintiff in this case was out of keeping with the charging practices the WPD had followed in other cases. The Defendants' assertion of confidentiality with respect to the records of other officers charged with dishon-

esty has prevented the Plaintiff from developing a factual record on this point. Therefore, Defendants' motion for summary judgment as to racial discrimination and retaliation under Title VII and § 1983 is premature and is denied without prejudice, because the Defendants have not permitted sufficient development of the record regarding differential treatment, as is more fully described in section B below.

### 2. Section 1983 Claim for First Amendment Retaliation

█ Plaintiff alleges in Count II of the complaint that Defendants retaliated against him for filing the Charge of Discrimination with the Delaware Department of Labor by "harassing and intimidating Plaintiff and placing him in unfavorable job positions," thereby depriving him of his First Amendment right to free speech in violation of 42 U.S.C. § 1983. (D.I. 1 at ¶¶ 129–135.) In *Shehee v. City of Wilmington*, 205 F.Supp.2d 269 (D.Del.2002), the court summarized the three-step process for evaluating a public employee's free speech retaliation claim:

> First a plaintiff must establish that the speech in question was protected. For this purpose, the speech must involve a matter of public concern. If the speech is of public concern, a plaintiff must demonstrate that his interest as a citizen in commenting on matters of public concern outweighs the states' countervailing interest as an employer in promoting the efficiency of the public service it provides through its employees.

> \* \* \* \* \* \*

If the court finds that the speech is protected, a plaintiff must show that the speech was a substantial or motivating factor in the alleged retaliatory action taken by the employer. Finally, the public employer can rebut the claim by demonstrating by a preponderance of the evidence that it would have been reached the same decision even in the absence of the protected conduct.

*Id.* at 276 (citations and quotation marks omitted). The determinations in the first stage of the analysis (protected speech) are questions of law for the court, while the second (retaliatory motive) and third (rebuttal of retaliatory motive) stages of the analysis are questions of fact. *See id.*

█ This court has determined that filing an EEOC complaint constitutes protected speech. *Parker v. State*, 11 F.Supp.2d 467, 478 (D.Del.1998). Plaintiff's allegations in this case thus satisfy the first stage of the free speech retaliation claim analysis. The next issue, then, is whether Plaintiff can show that filing the complaint was a substantial or motivating factor in Defendants' alleged retaliation. Here, Plaintiff has not and apparently cannot meet that burden. Three of Plaintiff's fifteen charges of retaliation include acts allegedly committed by Cpt. Crowley, but "Plaintiff concedes that the record lacks evidence of retaliatory acts by Defendants Crowley and Dietz." (D.I. 75 at 24.)[7] Four allegations of retaliation include delays in receiving back pay, in receiving a salary increase, and in the delivery of a copy of the Appeal Board's written decision.[8] Three other claims involve acts committed by unnamed defendants,[9] three claims involve staffing decisions made by Cpt. Donohue,[10] and two

---

7. (*See* D.I. 1 at ¶¶ 70–75, 76–79, 80.)

8. (*See id.* at ¶¶ 57–61, 64–69.)

9. (*See id.* at ¶¶ 90–94, 95, 96–97.)

10. (*See id.* at ¶¶ 52–56, 62–63, 81–84.) Plaintiff does not mention Cpt. Jubb in his retaliation claim, and only states, without explanation, that Defendants City of Wilmington, the

claims involve charges filed by Sgt. Fox against Plaintiff pursuant to WPD regulations for misplaced clothing.[11] Plaintiff has not provided any factual evidence to establish that his filing of a complaint was a substantial or motivating factor in those actions by Defendants. In fact, in the Answering Brief, Plaintiff claims that "it is equally, if not more probable, that the retaliation Plaintiff suffered was the result of his having exercised his appeal right and won reinstatement." (D.I. 75 at 20.) Since Plaintiff has not provided any facts to support the allegation that Defendants retaliated against him for filing an EEOC claim, Defendants' motion for summary judgment with respect to Plaintiff's § 1983 claim for violation of his First Amendment rights to free speech will be granted.

### 3. Sections 1985 and 1986 Claims

In Count VI of the complaint, Plaintiff claims that Defendants, specifically the City of Wilmington, the WPD, Sgt. Fox, Cpt. Jubb, Cpt. Crowley, Cpt. Dietz, and Cpt. Donohue have violated and conspired to violate Plaintiff's civil rights in contravention of 42 U.S.C. § 1985. Section 1985(3) states:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The Third Circuit has stated that in order to state a claim under Section § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) motivated by a racial animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997).

■■ In Count V, Plaintiff alleges that Defendants, specifically the City of Wilmington, the WPD, and Chief Boykin have violated Plaintiff's civil rights as set forth in 42 U.S.C. § 1986. Section 1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent ... the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured ....

Therefore, to adequately establish a violation of Section 1986, a plaintiff must show the existence of a Section 1985 conspiracy. *See Clark v. Clabaugh,* 20 F.3d 1290, 1295 n. 5 (3d Cir.1994). A conspiracy involves a "combination agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." *Fioriglio v. City of Atlantic City,* 996 F.Supp. 379, 385 (D.N.J.1998) (citing *Darr v. Wolfe,* 767 F.2d 79, 80 (3d Cir. 1985)).

■ In the motion for summary judgment, Defendants point out that Plaintiff

---

WPD, and Chief Boykin "tolerated" the harassment and retaliation against Plaintiff for exercising his First Amendment rights. (*See id.* at ¶ 142.)

**11.** (*See id.* at ¶¶ 85–89.)

did not allege in the complaint "how such a conspiracy took place or detail the steps of any single conspirator" (D.I. 66 at 34), and Plaintiff does not address the issue of conspiracy in his Answering Brief, apparently conceding that he can allege no basis for a claim of conspiracy. Therefore, given the lack of evidence suggesting a conspiracy by Defendants to deprive Plaintiff of equal protections and privileges under the law, Plaintiff has failed to create a genuine issue of material fact as to whether Defendants conspired against him, and summary judgment will be granted in favor of Defendants on Plaintiff's §§ 1985 and 1986 claims.

### 4. Liability of Defendant City of Wilmington

■ Defendants correctly argue that the City of Wilmington is not liable for the alleged constitutional violations under 42 U.S.C. § 1983. The City, as a municipality, does not bear *respondeat superior* liability for the constitutional torts of its employees. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir.1997). "Municipal liability attaches only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury' complained of." *Id.* at 1295 (quot-

ing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Plaintiff concedes that the City of Wilmington "has not adopted a policy to discriminate or retaliate against black police officers," but argues that if an official with final policy-making authority commits a tort, or ratifies a subordinate's unconstitutional action, municipal liability may also arise. (D.I. 75 at 21.) In this case, Plaintiff asserts that the Chief of Police of the WPD, Chief Boykin, and Cpt. Jubb, Captain of the Internal Affairs Division, had "unequivocal power to shape policy in the WPD's disciplinary process" under WPD Directive 8.8.C,[12] yet "allowed the practice and custom of charging and punishing black officers more frequently and severely for charges of dishonesty." (*Id.* at 21–22.) Therefore, according to Defendants, the City of Wilmington is liable. (*Id.*)

■ However, the Chief of Police of the WPD is not a "final policy maker" with respect to police discipline or disciplinary actions within the WPD. *See Izquierdo v. Sills*, 68 F.Supp.2d 392, 408–409 (D.Del. 1999) (holding that the Chief of Police did not have final policy making authority over the Delaware Law Enforcement Officers' Bill of Rights, the Collective Bargaining Agreement between the City of Wilming-

12. WPD Directive 8.8.C states:
The Captain of the Internal Affairs Division and/or the Chief of Police, within five (5) days of receipt of the Complaint Hearing Board's decision and recommendation, may convene an Appeal Board to consider the following:
1. Whether the Complaint Hearing Board was not carried out in a manner fair to both employee and to the Internal Affairs Division prosecuting the case; or
2. Whether the decision of the Complaint Hearing Board was not supported by the evidence; or
3. Whether the punishment imposed was too lenient or too harsh in view of the

character of the offense. Should the Captain of Internal Affairs and/or the Chief of Police decide to convene on the Appeal Board, he shall state the reasoning behind his decision in writing. A copy of this decision shall be sent to the employee.
4. Should the Captain of the Internal Affairs Division and/or the Chief of Police call for the convening of the Appeal Board, the employee shall be notified in writing and be given the opportunity to request within five (5) days whether he wishes to be present, have an attorney, and/or present testimony and evidence before the Appeal Board or just make written submissions.

ton and the Fraternal Order of Police Lodge # 1, or the Wilmington Police Officer's Manual, the three principal sources that govern the police disciplinary process, and, therefore, even if the Chief of Police created rules in contravention of any of these sources, his actions did not create policy attributable to the city). Influence or discretion has never been the determinant of final policymaking authority.

> The fact that a particular official ... has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 482–483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citation omitted). *See also Bailey v. City of Wilmington,* Civ. A. No. 96–264 MMS, 1997 U.S. Dist. LEXIS 18941 at *17–24 (D.Del. Oct. 31, 1997) (granting summary judgment for the City of Wilmington because neither the Chief of Police, the Office of Professional Standards, the Complaint Hearing Board, or the Appeal Board are individuals or entities with final policy making authority). Thus, as the City of Wilmington has not adopted a policy to discriminate or retaliate against black police officers, and Chief Boykin and Cpt. Jubb are not final policy makers, Plaintiff has not established a basis for municipal liability under § 1983 and Defendants' motion for summary judgment with respect to the City of Wilmington will be granted.

### 5. Absolute and Qualified Immunity

Defendants allege that Plaintiff's civil rights claims against the individual Defendants are barred by both absolute immunity and qualified immunity.

(D.I. 66 at 35.) In *Williams v. Department of Public Safety,* Civ. A. No. 82–738 WKS, 1983 U.S. Dist. LEXIS 10644 (D.Del. Dec. 19, 1983), the court held that police disciplinary hearing board members and the police officers who prosecuted and assisted in the prosecution are absolutely immune from an award of damages. *Id.* at *11–14. Citing *Williams,* Defendants argue that Cpt. Dietz, Cpt. Crowley, and Cpt. Donohue were members of Plaintiff's disciplinary Hearing Board and are thus entitled to absolute immunity. As Plaintiff has not cited any authority in the Answering Brief (D.I.75) to contradict *Williams,* or offered any authority to rebut the claim that the Board members are entitled to absolute immunity from an award of damages, I hold that Cpt. Dietz, Cpt. Crowley, and Cpt. Donohue are absolutely immune from an award of damages for the roles they filled as Board members in Plaintiff's disciplinary hearing. However, Plaintiff also claims that Cpt. Donohue and Chief Boykin discriminated and retaliated against him by assigning him to the camera room. (D.I. 75 at 24.) This alleged discrimination and retaliation occurred outside the scope of their capacity as Hearing Board members. Therefore, those Defendants are not absolutely immune from any discriminatory or retaliatory acts that Plaintiff may be able to prove occurred outside their roles in the disciplinary proceedings.

Defendants also assert that Cpt. Jubb and Sgt. Fox are absolutely immune from an award of damages under *Williams* because of the decisions and actions taken by them in their capacities as prosecutors and investigators. (D.I. 66 at 36.) In *Williams,* the court held that the prosecutor was entitled to absolute immunity because "[h]e presented the case against [plaintiff] to the Hearing Board, just as the state's attorney would do in a criminal

proceeding." 1983 U.S. Dist. Lexis 10644 at *14–15. However, *Williams* also stated that where the "actions in question are more investigative or administrative," absolute immunity does not apply. *Id.* at *15. In the case at bar, Sgt. Fox's role was primarily investigative. Indeed, he investigated Plaintiff's entire dishonesty case. (D.I. 66 at 3–7.) There is thus a plain distinction between his role and that of the prosecutor in *Williams* who acted "just as the state's attorney would do in a criminal proceeding." 1983 U.S. Dist. Lexis 10644 at *15. Cpt. Jubb, as the Commanding Officer of OPS, was apparently not even on the prosecutorial team. (D.I. 66 at 3–7.) Therefore, Cpt. Jubb and Sgt. Fox are not absolutely immune from an award of damages.

 Finally, Defendants assert that summary judgment must be granted in favor of the individual Defendants based upon the principles of qualified immunity. (D.I. 66 at 37.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Third Circuit has said that in determining whether qualified immunity applies, the issue is "whether a reasonable public official would know that his or her specific conduct violated clearly established rights." *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir.1996). Defendants argue that they "are entitled to summary judgment, even if Plaintiff adequately alleges in his complaint acts which violate clearly established law, if discovery fails to disclose evidence sufficient to create a genuine issue as to whether the Defendants [discriminated

and retaliated against Plaintiff on the basis of race]." (D.I. 66 at 37) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). However, as is more fully discussed herein, Defendants have not permitted Plaintiff to make appropriate inquiry into facts which bear on the establishment of a prima facie case of discrimination or retaliation. Accordingly, Plaintiff's motion concerning qualified immunity of the individual Defendants is denied without prejudice. Like the motion for summary judgment on the racial discrimination and retaliation claims, it is premature.

### B. Motion to Compel

Pursuant to Fed.R.Civ.P. 37(a), Plaintiff seeks to compel Defendants to respond to interrogatories 2, 3, 8 and 14, to comply with document production requests 2, 7, 12, 18 and 20, to have a deponent reveal the name of an officer about whom the deponent earlier testified, and to produce one of the defendants for a second round of deposition questioning. (D.I.47.) Specifically, Plaintiff seeks the production of the Office of Professional Standards ("OPS") files for thirty-seven officers charged and/or convicted of dishonesty and/or inaccurate reporting since 1991, information regarding camera room assignments since 1991, information regarding officers who attended training while serving punishment for a dishonesty conviction, while under criminal investigation, or while on administrative or light duty, the name of an officer whom Officer Richard Sutton identified at his deposition as having been charged with dishonesty, and an opportunity to re-depose Cpt. Dietz after having obtained the OPS files.

In opposition to Plaintiff's motion to compel, Defendants claim that the OPS files, the camera room assignment information, the information concerning officers

serving punishment for a dishonesty conviction, and the name of the officer mentioned at Officer Sutton's deposition are privileged by the "Law Enforcement Officer's Bill of Rights," 11 Del. C. § 9200 *et. seq.* (D.I. 51 at ¶¶ 1–2.) Under § 9200(c)(12):

> Whenever a law-enforcement officer is under investigation or is subjected to questioning for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions.... All records compiled as a result of any investigation subject to the provisions of this chapter and/or a contractual disciplinary grievance procedure shall be and remain confidential and shall not be released to the public.

§ 9200(d) provides:

> Unless otherwise required by this chapter, no law-enforcement agency shall be required to disclose in any civil proceeding, other than those brought by a citizen against a law-enforcement officer alleging that the officer breached the officer's official duties and that such breach resulted in injury or other damage to the citizen, any: (1) Personnel file; or (2) Internal affairs investigatory file compiled in connection with a law-enforcement officer under investigation or subjected to questioning for any reason which could lead to disciplinary action, demotion, or dismissal.

According to Defendants, disclosure of the information Plaintiff seeks, specifically the OPS files, "is clearly prohibited by § 9200(c)(12) and (d)." (D.I. 51 at 3.)

In support of its argument that §§ 9200(c)(12) and (d) protect against the disclosure of the OPS files, etc., Defendants cite *Bailey v. City of Wilmington,* No. 96–264 MMS, 1997 WL 557555 (D.Del. Aug.14, 1997). In *Bailey,* a former WPD police officer requested "any" complaints filed against the presiding officer of the administrative hearing that ultimately led to the *Bailey* plaintiff's dismissal, in order to support his wrongful termination lawsuit against the City. 1997 WL 557555 at *1. The court held that "it cannot be avoided that [the presiding officer] is [not] named a defendant.... Under the plain language of § 9200(d), then, the City is not required to disclose any complaint filed with the Office of Professional Standards against [the presiding officer], and the Court declines to read the statute more broadly than it is written." *Id.* at *3. While this interpretation of § 9200(d) comports with several cases involving the disclosure of police officer personnel files to a citizen who names a police officer as a defendant in a civil rights case,[13] there are several cases involving police department employees who, like Plaintiff, brought suit under Title VII, seeking to compel production of police officer personnel files who were not named defendants. *See Mercado v. Division of New York State Police,* 989

---

**13.** *Revelle v. Trigg,* No. Civ. A. 95–5885, 1999 WL 80283 at *5–*8 (E.D.Pa. Feb.2, 1999) (granting a motion to compel the District Attorney to comply with a subpoena requesting personnel files of police officer defendants named by plaintiff arrestee in civil rights complaint); *Crawford v. Dominic,* 469 F.Supp. 260 (E.D.Pa.1979) (granting, subject to conditions, a motion to compel discovery of police officer personnel files in civil rights action brought by a citizen against police officer defendants); *Dos Santos v. O'Neill,* 62 F.R.D. 448 (E.D.Pa.1974) (granting plaintiffs' motion to compel production of defendant police officer's personnel files). *See also Horizon of Hope Ministry v. Clark County,* 115 F.R.D. 1, 6 (S.D.Ohio 1986) (holding that police officer personnel files are discoverable in a federal civil rights action because under federal law there exists no general privilege for personnel files).

F.Supp. 521 (S.D.N.Y.1998) (granting plaintiff's motion to compel discovery of personnel files of police officers who were not named defendants in Title VII action); *Gavenda v. Orleans County*, 174 F.R.D. 265 (W.D.N.Y.1996) (*see id.*); *Watts v. Kimmerly*, No. 1:95–CV–279, 1996 WL 911254 (W.D.Mich. Apr.12, 1996) (affirming magistrate's order that granted plaintiffs' motion to compel discovery of personnel files of police officers who were not named defendants in Title VII action).

In *Mercado*, 989 F.Supp. 521, the defendant, Division of New York State Police, argued that the police officer personnel files sought by a former New York State police officer were privileged against disclosure under New York Civil Rights Law § 50–a. That section provided that the personnel files of police officers are not to be disclosed except by consent of the individual or pursuant to court order. *Id.* at 522. Even though the court found that "[t]his New York statute does not govern discovery in federal cases, and there is no analogue in federal law to this provision," the court stated that "a federal court must balance the plaintiff's interest in disclosure against the state's legitimate concern of protecting the confidentiality of the officers' personnel files from unnecessary intrusions." *Id.* Stating that the personnel records might be relevant to prove that similarly situated white officers were treated differently, and that evidence concerning the decision-making process resulting in plaintiff's termination was "critically relevant," the court held that "if defendant requests, plaintiff shall enter into a confidentiality agreement for the courts' signature, at which time defendant shall produce the disciplinary records at issue." *Id.* at 523.

■ As did the court in *Mercado*, I find that the OPS files that Plaintiff seeks are relevant to prove whether the thirty-seven other officers charged and/or convicted of dishonesty and/or inaccurate reporting were similarly situated to Plaintiff.[14] In order to establish a prima facie case of unlawful discrimination, Plaintiff must prove that he and those other officers were similarly situated. The evidence concerning Defendants' decision-making process in leveling disciplinary charges and in pursuing disciplinary proceedings is highly relevant because it will either help establish Plaintiff's prima facie case of discrimination, or, on the other hand, help substantiate Defendants' non-discriminatory reasons for Plaintiff's treatment.[15] While I am mindful of Defendants' assertions that production of the files will be "overbroad, burdensome, and duplicative" (D.I. 51 at ¶ 4), the balance here favors production, with appropriate limitations. There are thirty-seven specifically identi-

---

**14.** This opinion is not intended to put in question in any way the validity of the former WPD Directive that required dismissal after two findings of police officer dishonesty, or the current WPD Directive that requires dismissal after one finding of dishonesty. (D.I. 66 at 9.) Following discovery in this case, summary judgment for Defendants may be warranted. However, as discussed in section A of this Opinion, Plaintiff claims that he was discriminated against because he was fired after being found guilty on multiple charges of dishonesty, when, in effect, both charges arose out of the same incident. (D.I. 75 at 16.) Plaintiff will be allowed an opportunity to develop evidence to support his claim that the filing of multiple charges against him was not in keeping with WPD practices in leveling disciplinary charges against non-African Americans.

**15.** Not only is the evidence pertinent to the prima facie case Plaintiff is required to establish, it is potentially relevant to the burden plaintiff bears to show that any non-discriminatory reasons advanced by Defendants for Plaintiff's firing are pretextual. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

fied personnel files as issue. Therefore, Defendants shall make available the OPS files that Plaintiff has requested, with appropriate safeguards against misuse of the information.[16]

■ Defendants shall also produce responsive information regarding camera room assignments and training opportunities because that information is also relevant to Plaintiff's ability to establish his prima facie burden with respect to his retaliation claim. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997). To the extent that the information sought at the deposition of Officer Sutton is no longer "the subject of ongoing litigation,"[17] Defendants shall produce that information, and shall provide for the re-deposition of Cpt. Dietz for provision of the single piece of information requested by Plaintiff. At the request of Defendants, and as earlier instructed, *supra n.* 16, Plaintiff shall enter into an agreement to keep confidential the foregoing records and any deposition testimony based upon them.

### C. Motion to Seal

Defendant City of Wilmington's motion to seal the deposition transcript of Plaintiff is before the court because Plaintiff, in his deposition on July 11, 2001, disclosed the names of certain other WPD officers who "either were under investigation or disciplined by the [WPD's] Office of Professional Standards." (D.I.65.) Because Defendants' motion is unopposed and because

public policy does support the confidentiality of police officer personnel files, *see* Del. C. § 9200(c), the motion to seal is granted.

### IV. Conclusion

For the reasons set forth herein, Defendants' motion for summary judgment (D.I.70) will be denied in part and granted in part, Plaintiff's motion to compel (D.I.47) will be granted, and Defendant City of Wilmington's motion to seal (D.I.65) will be granted. An appropriate order will issue.

### *ORDER*

For the reasons set forth in the Memorandum Opinion issued on this date,

IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (D.I.70) is DENIED WITHOUT PREJUDICE as to the claims of racial discrimination and retaliation under Title VII and § 1983, and is GRANTED as to the claim of First Amendment retaliation under § 1983, as to the claims under §§ 1985 and 1986, and as to the City of Wilmington's municipal liability defense. With respect to the Defendants' immunity defenses, which are also included in the motion for summary judgment (D.I.70), summary judgment is GRANTED as to the claims of absolute immunity by Cpt. Dietz, Cpt. Crowley, and Cpt. Donohue as Board members in Plaintiff's disciplinary

---

**16.** Defendants shall make the thirty-seven OPS files available for review on an "attorneys eyes only" basis initially, and thereafter, Plaintiff and Defendants shall discuss appropriate parameters for keeping this information confidential, e.g. providing for Plaintiff's counsel to photocopy only precisely relevant documents, allowing Defendants to redact irrelevant information prior to photocopying, etc. Any agreement between the parties concerning this production shall then be submitted for the court's approval. If the parties

cannot agree on the parameters for review of the OPS files, they shall submit their proposals to the court and I will enter a protective order with regard to the files.

**17.** At Officer Sutton's deposition, the attorneys for Defendants instructed Officer Sutton not to disclose the name of an officer charged with dishonesty because that dishonesty charge was the "subject of ongoing litigation." (D.I. 51 at 3.)

hearing; summary judgment is DENIED as to the claims of absolute immunity of Chief Boykin and Cpt. Donohue in any discriminatory or retaliatory acts that may have occurred outside their roles in the disciplinary proceedings; summary judgment is DENIED as to the claims of absolute immunity of Cpt. Jubb and Sgt. Fox; and summary judgment is DENIED WITHOUT PREJUDICE as to the claims of qualified immunity of the individual Defendants;

2. Plaintiff's motion to compel (D.I.47) is GRANTED; and

3. Defendant City of Wilmington's motion to seal (D.I.65) is GRANTED.